**UPSHER–SMITH LABORATORIES, INC., Plaintiff,**

v.

**MYLAN LABORATORIES, INC., and its wholly owned subsidiary, Mylan Pharmaceuticals, Inc., Defendants.**

**Civil No. 3–94–1148.**

United States District Court, D. Minnesota, Third Division.

July 9, 1996.

Edward F. Fox, St. Paul, MN, for plaintiff, Upsher–Smith Laboratories, Inc.

George G. Eck and William A. Dossett, Minneapolis, MN, for defendants, Mylan Laboratories, Inc., and Mylan Pharmaceuticals, Inc.

## ORDER

DAVIS, District Judge.

This matter is before the Court upon plaintiff and defendants' objections to and appeal of United States Magistrate Judge Erickson's Order and Report and Recommendation dated February 28, 1996. Pursuant to statute, the Court has conducted a *de novo* review of the record. 28 U.S.C. § 636(b)(1); Local Rule 72.1(c). Based upon that review and all the arguments of the parties, the Court ADOPTS the Report and Recommendation in its entirety.

The Court must also modify or set aside any portion of the Magistrate Judge's Order found to be clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R.Civ.P. 72(a); Local Rule 72.1(b)(2). Based on a review of the record and the submis-

sions of parties, the Court concludes that the Magistrate Judge's Order is neither clearly erroneous nor contrary to law. Therefore, it is HEREBY ORDERED that:

1. Plaintiff's Motion for Summary Judgment as to the Statute of Frauds defense is *granted;*

2. Plaintiff's Motion for Summary Judgment as to the commercial impracticability defense is *granted;*

3. Plaintiff's Motion for Summary Judgment as to defendants' affirmative termination of contract defense is *denied;*

4. Defendants' Motion for Summary Judgment as to plaintiff's intentional misrepresentation claim is *granted;*

5. Defendants' Motion for Summary Judgment as to plaintiff's negligent misrepresentation claim is *granted;*

6. Defendants' Motion for Summary Judgment as to plaintiff's claim of unjust enrichment is *granted;*

7. Defendants' Motion for Summary Judgment as to plaintiff's claim for equitable estoppel is *granted;*

8. That in all other respects, defendants' Motion for Summary Judgment is *denied;*

9. Plaintiff's Amended Motion in limine to exclude the testimony of Timothy Covington is *denied;*

10. Plaintiff's Amended Motion in limine to exclude the testimony of Kathy Hillman, John Romano and George Fields is *granted;*

11. Defendants' Motion for Leave to Amend their Answer is *denied;*

12. Defendants' Motion to Compel Discovery is *denied;* and

13. Defendants' experts Timothy Covington and Rholan Larson shall amend their expert reports as instructed in the text of this Order no later than Wednesday, July 10 at 9:00 am.

## ORDER AND

## REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

At Duluth, in the District of Minnesota, this 28th day of February, 1996.

## I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A) and (B), upon the following Motions:

1. The parties' cross-Motions for Partial Summary Judgment on the Defendants' Statute of Frauds defense.

2. The parties' cross-Motions for Partial Summary Judgment on the Defendants' termination of contract defense.

3. The Plaintiff's Motion for Partial Summary Judgment on the Defendants' commercial impracticability defense.

4. The Defendants' Motion for Partial Summary Judgment on the Plaintiff's breach of contract claim, that is premised upon the parties' asserted intention to only be bound by a written contract.

5. The Defendants' Motion for Partial Summary Judgment on the Plaintiff's breach of contract claim, on the ground that no agreement was reached on the alleged contract's exclusivity.

6. The Defendants' Motion for Partial Summary Judgment on the Plaintiff's breach of contract claim, on the ground that the alleged contract contained an open price term.

7. The Defendants' Motion for Partial Summary Judgment on the Plaintiff's damage claim for lost profits.

8. The Defendants' Motion for Partial Summary Judgment on the Plaintiff's implied contract claim.

9. The Defendants' Motion for Partial Summary Judgment on the Plaintiff's equitable estoppel claim.

10. The Defendants' Motion for Partial Summary Judgment which would limit the Plaintiff's entitlement to reliance damages to its promissory estoppel claim.

11. The Defendants' Motion for Partial Summary Judgment on the Plaintiff's claim of intentional misrepresentation.

12. The Defendants' Motion for Partial Summary Judgment on the Plaintiff's damage to business reputation claim.

13. The Plaintiff's Amended Motion *in limine* to limit or exclude the Defendants' expert testimony.

14. The Defendants' Motion for Leave to Amend their Answer.

15. The Defendants' Motion to Compel Discovery.

A Hearing on these Motions was conducted on November 21, 1995, at which time the Plaintiff appeared by Edward F. Fox and Jonathan C. Miesen, Esqs., and the Defendants appeared by George G. Eck, Esq.

For reasons which follow, the Defendants' Motions to Amend their Answer, and to Compel Discovery, are denied. We recommend that the Plaintiff's Amended Motion *in limine* be granted in part, and denied in part; that the Plaintiff's Motion for Summary Judgment on the Statute of Frauds and the commercial impracticability defenses be granted; that the Defendants' Motion for Summary Judgment on the intentional misrepresentation and equitable estoppel claims be granted; and that the remaining Motions for Summary Judgment be denied.[1]

## II. *Factual and Procedural History*

The Plaintiff, Upsher–Smith Laboratories, Inc. ("USL"), is a distributor of generic pharmaceutical products, while the Defendants Mylan Laboratories, Inc., and Mylan Pharmaceuticals, Inc. ("Mylan"), manufacture generic pharmaceuticals. In this action, USL alleges that Mylan contractually agreed to supply USL with all of its requirements for a drug known as Cimetidine. USL also contends that Mylan wrongfully breached their contract by refusing to supply Cimetidine to USL.

Cimetidine is part of a family of drugs known as "$H_2$-receptor antagonists." These drugs reduce stomach acid and, as a consequence, they are widely used in the treatment of ulcers and other gastrointestinal disorders. The parties agree that the domestic market for $H_2$-receptor antagonists is extremely large, with annual sales in the billions of dollars. Cimetidine was first manufactured and marketed by SmithKline Beacham ("SKB"), which merchandises Cimetidine under the brand name Tagamet®. Other $H_2$-receptor antagonists include Zantac®, Pepcid® and Axid®. As the innovator of Cimetidine, SKB held an exclusive patent on the drug, which enabled SKB to charge an inflated price for Tagamet.

SKB's Cimetidine patent expired on May 17, 1994, and, with that expiration, the generic pharmaceutical companies had an opportunity to enter the Cimetidine market with their own generic labels. The parties agree that, when generic drug companies enter a market that has recently been opened by a patent's expiration, the initial price, of their generically competing product, is quoted at a certain percentage below the price of the formerly patented brand. Thereafter, as the competition between the generic companies escalates, the generic price will "erode" to a level that is determined by the competitive market forces. The erosion in prices can occur rapidly, depending upon the number of generic companies that have entered that market upon the expiration of the pertinent patent. Therefore, based upon the dynamics of the market, in order to ensure the maximum potential for profit from the sale of a new generic drug, the new product must enter the market at, or shortly after, the date of patent expiration.

Complicating the process is the fact that a manufacturer of generic pharmaceuticals must receive approval, from the Food and Drug Administration ("FDA"), before it may produce a new generic drug. The approval is provided by the FDA's award of an Abbreviated New Drug Approval ("ANDA"). To obtain an ANDA, the FDA must first approve the generic manufacturer's raw material supplier. As a consequence, once an ANDA is approved, the generic manufacturer becomes dependent upon its approved raw material supplier, unless the manufacturer has gained approval for a second supplier—a

---

1. Originally, the Defendants had also moved for Summary Judgment on the Plaintiff's negligent misrepresentation and unjust enrichment claims. The Plaintiff has affirmatively represented that it has no opposition to these Motions and, therefore, we recommend that they be granted as well.

process which can consume up to two years in time.

In October of 1993, Mylan became the first generic manufacturer to receive an ANDA for Cimetidine. Mylan intended to market its generic Cimetidine to its customer base of warehousing chains, wholesalers and distributors, beginning on May 18, 1994—the date on which SKB's patent would expire. Mylan selected Lek d.d. Ljubljana ("Lek"), a Slovenian materialsman, as the supplier of the active ingredient in Cimetidine, and Lek received the FDA's approval. Mylan had selected and received FDA approval for Lek d.d. Ljubljana ("Lek"), a manufacturer headquartered in Slovenia.

It was Mylan's expectation that the generic Cimetidine market would flourish and, accordingly, in November of 1993, Mylan submitted a large initial purchase order with Lek, for Cimetidine active ingredient. As a result of restrictions, that were imposed by the Federal Patent Regulations, Mylan was unable to stockpile either the raw materials, or finished Cimetidine product, prior to the expiration of SKB's patent. However, prior to the expiration of the SKB patent, the Regulations allowed Mylan to manufacture three lots of each dosage strength of Cimetidine, for FDA validation purposes. On May 18, 1994, these "validation lots" would be available for commercial sale. In the Winter of 1994, Lek shipped the raw materials that were required for the validation lots.

In November of 1993, while placing its initial raw materials purchase order, Mylan sensed that Lek might be either unwilling, or unable, to fill an initial order that was any larger than that Mylan had submitted. By February of 1994, however, Mylan decided to "be bullish" on Cimetidine. Accordingly, Mylan commenced negotiations with Lek so as to increase the volume of the initial purchase order, and these negotiations proved successful in securing some additional deliveries of raw material, which would arrive about 30 days after SKB's patent expiration date. In addition, in March of 1994, Mylan commenced its search for a second supplier of Cimetidine raw materials.

At the same time—in March of 1994—Mylan began accepting pre-book orders for its generic Cimetidine product. At that time, Mylan was the only generic manufacturer to hold an ANDA for Cimetidine. Consequently, Mylan's pre-book orders for March and April ran extremely high but, according to Mylan, the reliability of these pre-book orders was discounted since, predictably, these orders were an imperfect indicator of likely future sales. Mylan asserts that it reasonably anticipated that several other generic manufacturers would receive Cimetidine ANDAs before the expiration of the SKB patent. Upon the entry of those competitors into the Cimetidine market, Mylan assumed that the rate of its pre-book orders would decrease, and many of the existing pre-book orders would cancel as other sources of Cimetidine would appear.

The anticipated expansion in the competitive sources of Cimetidine, however, did not develop and, by the end of April in 1994, only two other generic manufacturers—Endo Laboratories, Inc. ("Endo"), and Novapharm Laboratories, Inc. ("Novapharm")—had received ANDAs for Cimetidine. To further complicate matters, both Endo and Novapharm received their raw materials from Lek, who also supplied Mylan, while another competitor—Lederle Laboratories, Inc. ("Lederle"), was supplied by SKB, the original patent-holder of Cimetidine.

In February of 1994, USL arranged to meet with Rod Jackson ("Jackson"), who was then Mylan's Vice President for Business Development, in order to inquire whether Mylan would be interested in supplying Cimetidine to USL. The two companies had not previously conducted business with one another. USL proposed a "private label" arrangement, whereby Mylan would supply Cimetidine to USL, and USL would then market the product through its own trademarked private label brand. The private label product would be merchandised, by USL, to certain "niche markets" in which USL already had a strong relationship, such as to independent pharmacies and to managed care groups. USL's marketing strategy was to create a demand for the product by directly competing for a market share with Tagamet, and with the other $H_2$-receptor antagonists, such as Zantac. USL maintained

that it did not intend to target other generic Cimetidine products, and that it hoped to "launch" its private label product either at, or shortly after, the expiration of the SKB patent.

Mylan contends that, after learning of this proposal, Jackson explained to the USL representatives that Mylan would not generally sell to generic wholesalers or distributors under a private label.[2] Nevertheless, Mylan acknowledges that USL's proposal interested Jackson, as the private label that USL proposed would not compete with other generic products but, rather, would be rivaling branded products like Tagamet, and certain of the other brand name $H_2$-receptor antagonists. Mylan, however, had already signed a formal co-marketing Cimetidine agreement with Eli Lilly & Co. ("Lilly"). As a consequence, Jackson informed the USL representatives that the approval of Lilly had to be secured before Mylan could conduct further negotiations concerning USL's private label proposal. Subsequently, USL met with Lilly and, on March 28, 1994, Jackson told USL that Lilly did not have any objections to USL's proposal.

After receiving this clearance from Lilly, in April of 1994, USL undertook a series of efforts to launch its private label brand of Cimetidine. USL obtained the Cimecon trademark in order to distinguish its Cimetidine product, and it hired a market research firm to develop a market survey that was to reveal the sales potential of its product line. USL also hired new sales representatives to support the Cimecon project, it designed the required labels and package inserts, and it retained advertising agencies to develop a media campaign to announce the imminent release of Cimecon following the expiration of SKB's patent. According to USL, these marketing activities were taken with the full knowledge and encouragement of Mylan.

On April 8, 1994, USL transmitted to Jackson a listing of the information that was required of Mylan in order to facilitate the potential launch of Cimecon, including details on labeling, on package inserts, on order forecasting, on logistics and on regulatory affairs. On April 19, 1994, USL telefaxed a revised listing of requested information to Jackson and, later, called Jackson with a request for price quotes on a Cimecon contract. Jackson responded that Mylan's Sales & Marketing Department was responsible for all price negotiations, and he directed USL to work with that Department in discussing the details of a supply arrangement. Jackson also informed USL that Dale Martin ("Martin"), who was Mylan's Director of Advertising and Promotions, would be the individual responsible for obtaining the information requested in USL's revised list. As a precautionary measure, however, Jackson and USL executed a "Mutual Secrecy Agreement," prior to submitting USL's information listing to Martin. Mylan contends that the Mutual Secrecy Agreement was the only contract that was ever consummated between the parties as a result of their negotiations.

On April 26, 1994, Martin participated in a telephone conference call with Paul Kralovec ("Kralovec"), USL's Vice President of Finance, and with three other USL executives. The substance of this call is in serious dispute. According to Mylan's version of the events, the parties merely addressed some of the details of a potential supply arrangement. In the course of their conference, the parties agreed that USL would draft a written contract that would be sent to Mylan as soon as possible. In response to the suggested prices, that USL had earlier provided Jackson, Martin countered with a set of higher prices which were referred to as "first-stage prices." Martin is said to have advised USL that its purchases would be required in "lot quantities," which meant production lots. USL agreed to purchase the 300mg and 400mg tablet strengths in lot quantities, but asked to be able to purchase the 200mg and 800mg tablet strengths in lesser quantities because they would be a smaller volume product. This issue was not resolved. Martin also informed USL that, in order to be entered into Mylan's production calendar, it

2. Mylan states that, currently, it has retained Qualitest as its sole private label customer. Mylan is able to sell to Qualitest on a private label basis, because Qualitest, in turn, sells to K–Mart, which is one of the nation's largest pharmacy chainstores. Mylan asserts that, in order to sell to K–Mart, it must first sell to Qualitest on a private label basis.

would be necessary for USL to submit formal purchase orders, together with a 12–month forecast of its orders, which the parties referred to as a "rolling forecast." USL did not object to these conditions, but never forwarded either a purchase order or a rolling forecast to Mylan.

The parties never discussed whether USL would be obligated to purchase Cimetidine exclusively from Mylan, nor did they specify the duration of the supply arrangement, or the manner in which their expected contract could be terminated. Martin did inform USL that Mylan could not ship USL's product out of the validation lots, which contained the only product that Mylan would have available for sale immediately after the expiration of SKB's patent. Martin also predicted that it would take Mylan 60 days in which to process USL's labels. As a consequence, the parties expected that Mylan would deliver its first shipments of Cimecon to USL in late June of 1994.

USL requested that Mylan agree to provide it with "price protection." According to Mylan, in the pharmaceutical industry, the term "price protection" customarily refers to price adjustments on those products that have been purchased and shipped to the customer's inventory. If the manufacturer should lower its list price for that product, before the purchaser resells the entire shipment, then the manufacturer will provide that purchaser a credit that would be equal to the difference between the invoice price and the lower price on each product remaining in the purchaser's inventory. Mylan has a formal price protection agreement, which it enters with some customers, but not with others, and, while Mylan discussed price protection with USL, the parties did not agree to any such terms.

On the other hand, USL's version of the parties' conference call differs markedly from that recounted by Mylan. According to USL, during the conference, the parties reached an oral contractual agreement that bound Mylan to supply USL with its Cimetidine requirements. Furthermore, Martin is said to have informed the USL executives that a formal written contract would not be necessary, as USL could trust Mylan to honor its word. Although USL responded that it was comfortable in dealing with Mylan on such a basis, it expressed an intent to send Mylan a short letter that would confirm the pricing and the other basic terms of their agreement.

According to USL, the parties agreed that Mylan would be the exclusive supplier of USL's Cimetidine requirements, and that Mylan consented to providing USL with price protection so as to protect USL's profitability. USL submitted an opening order for Cimetidine during this conference call, in addition to informing Mylan that it would be placing orders, in lot quantities, every three to four months. No formal written forecasts were submitted, because Mylan advised USL that USL would not need to submit any written forecasts during the first six months of the supply agreement. USL also maintains that, throughout these negotiations, Martin and Jackson extended assurances that USL could receive its initial Cimetidine delivery by June 1, 1994.

On April 29, 1994, Kralovec telefaxed a letter to Martin which USL claims is confirmatory of the parties' agreement. In that letter, Kralovec relates that he "thought it might be helpful to summarize what has been agreed upon." The letter then lists the prices for the various strength dosages of Cimetidine, and specifies the place of delivery as "FOB Upsher–Smith Laboratories, Inc., Minneapolis." The letter also recounts that "no specific price protection arrangement was defined," but that Mylan had agreed to "address changes in [USL's] acquisition cost in order to help protect our profitability in light of any changes in market conditions." The letter mentions minimum order sizes, which are listed as lot size quantities for the 300mg and 400mg tablet strengths, and as a "reasonable quantity" for the 200mg and 800mg strengths. Finally, with respect to the frequency of orders, the letter states that purchases "will be submitted via a rolling 12 month forecast," to be updated "by the 15th of each month," and firm purchase orders would be sent 90 days in advance of shipment.

In the course of that letter, Kralovec expresses USL's understanding, that the fre-

quency of orders would retain some flexibility during the first six months of the arrangement, but that the flexibility would be limited thereafter. Mylan admits to receiving Kralovec's letter, and it further acknowledges that it never objected to the letter in writing.

After sending that letter, USL claims to have engaged in further activities in preparation for its expected Cimecon launch. These activities included the publication, in national trade journals, of advertisements that announced the Cimecon launch, and the direct mailing of advertisements to over 67,-000 independent pharmacies and other USL customers. According to USL, it was then completing a full-color print advertising campaign, in support of its Cimecon launch. Throughout all of this advertising, USL maintained that Cimecon would be available in the marketplace promptly upon the expiration of the SKB patent.

On or about April 6, 1994, Mylan became aware that its pre-book orders for Cimetidine were double its supply of raw material. At this time, Mylan's executives determined that Mylan would have to allocate Cimetidine to its customers. Indeed, Mylan asserts that, later in that same month, it began to hear, for the first time, industry rumors that Mylan, Endo and Novapharm would be the only three generic manufacturers to have received Cimetidine ANDAs by the time of the expiration of SKB's patent. These rumors led Mylan to conclude that the anticipated cancellations in its pre-book orders might not transpire and that, as a consequence, Mylan would not have sufficient raw materials to produce the amounts of Cimetidine that would be necessary to fill its orders. As a result of these occurrences, Mylan states that, in late April of 1994, it began notifying its customers that, due to the shortage of raw materials, Mylan would have to allocate its supply of finished Cimetidine amongst its customers, and that the orders of some of Mylan's customers would have to be back-ordered altogether.

On April 29, 1994, Robert Lombardi ("Lombardi"), who was Mylan's Vice President for Sales and Marketing, contacted USL to advise that, because of a shortage in raw materials, Mylan might be unable to supply USL with Cimetidine by June 1, 1994. On May 2, 1994, Jackson telephoned Kralovec and informed him that, in light of the raw materials shortage, Mylan could not supply USL with any Cimetidine in support of the Cimecon project. After Jackson's telephone call, Kenneth Evenstad ("Evenstad"), USL's Chief Executive Officer, and Milan Puskar ("Puskar"), the Chief Executive Officer of Mylan, engaged in a series of telephone calls in which Mylan's decision, to deny USL any supply of Cimetidine, was discussed. USL has averred that, in view of USL's protests and after consultation with other Mylan executives, Puskar stated that Mylan would supply USL with Cimetidine in order to support the Cimecon project.

Nevertheless, USL offers somewhat conflicting evidence as to when Mylan would begin to supply it with Cimetidine. Kralovec, who participated in the conference calls, avers that Puskar agreed that Mylan would supply USL with a "fair share" allocation of Cimetidine, at or about the time of patent expiration. Evenstad, however, has avowed that Puskar informed USL that Mylan could not supply Cimetidine to USL until September of 1994. Evenstad responded that any such delay was unacceptable, and that USL required some Cimetidine by the end of May. According to Evenstad, "it was sort of left up in the air in terms of when we were actually going to get product," but he maintains that Puskar assured him that he understood USL's problems, that he was "going to take care of it," and that, in light of this statement, Evenstad assumed that USL was "going to be getting [the] product within a couple of weeks."

On May 24, 1994, several USL executives travelled to Mylan's offices in Morgantown, West Virginia, in order to meet with several high-ranking Mylan executives, including C.B. Todd ("Todd"), who was the President of Mylan Pharmaceuticals. In Mylan's view, this meeting was nothing more than a USL sales presentation, but USL claims that its executives visited Mylan's offices in order to inspect Mylan's facilities and to finalize the remaining details concerning the launch of Cimecon. After this meeting, Todd met pri-

vately with the USL executives and informed them that Mylan would not supply USL with any Cimetidine to support the Cimecon launch. Todd advised that Mylan's supply problems with Lek precluded any delivery of Cimetidine at that time, however, Todd believed that the supply difficulties would resolve in three to six months, and he suggested that USL reopen negotiations with Mylan at that time.

USL maintains that its executives protested this announcement, and argued that the supply agreement between USL and Mylan had been confirmed by Puskar and Jackson. According to USL, Todd responded to these protests by denying any knowledge of USL's discussions with Puskar and Jackson, and voiced additional objections to any immediate supply of Cimetidine to USL's Cimecon project. Specifically, Todd maintained that the stated prices were too low, and that Mylan was not interested in supplying a private label product.

In the period between this meeting and mid-July of 1994, Mylan contends that almost no communication occurred between USL and Mylan. USL disputes this contention, however, and asserts that it continued to converse with Mylan in the hope of convincing Mylan to supply it with Cimetidine. Notwithstanding these attempts, USL found Mylan's representatives to be both evasive and nonresponsive. On July 21, 1994, Evenstad wrote a letter to Puskar which requested an immediate meeting between the parties in order to arrange the delivery of Cimetidine to USL at the earlier discussed prices.

In August of 1994, Mylan finalized a formal supply agreement with Lek, by which Lek had agreed to ship specific quantities of raw materials, over a period of years, pursuant to an express delivery schedule. Mylan states that, at this juncture, it reconsidered USL's proposal and, in a letter dated August 12, 1994, Mylan offered to sell private-label Cimetidine to USL, with delivery commencing in October of 1994, and at prices which were 40% higher than those discussed during the telephone conference of April 26, 1994. Mylan contends that the increased prices directly corresponded to a 40 percent increase in Mylan's cost for raw materials. In turn, USL maintains that these increased prices would not only have sustained Mylan's profit margins, but would have increased them. As USL views the matter, even allowing for the increased cost of raw materials, Mylan's profit margins would have exceeded 50%, if Mylan would have sold Cimetidine to USL at the earlier prices.

USL rejected Mylan's offer and, on September 8, 1994, commenced this action in Minnesota District Court, seeking to recover on causes of action for breach of contract, breach of an implied contract, promissory and equitable estoppel, intentional misrepresentation, negligent misrepresentation and unjust enrichment. On October 5, 1994, Mylan removed the action to this Court. The parties now seek to resolve a host of the claims and counter-charges by summary disposition.

### III. *Discussion*

We first address those Motions which fall within our non-dispositive jurisdiction, followed by a consideration of the Motions over which our jurisdiction is dispositive.

### A. *The Parties' Motions For Partial Summary Judgment.*

#### 1. *Standard of Review.*

Summary Judgment is neither an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury to weigh the evidence and to render credibility determinations. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986). Summary Judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Rule 56, Federal Rules of Civil Procedure.* For these purposes, a disputed fact is "material," if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine," if the evidence is such that a reasonable Jury could return a Verdict for the non-moving party. See, *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) ("An issue of material fact is genuine if it has a real basis in the record."); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66–67 (8th Cir.1994).

As Rule 56(e) makes clear, once the moving party presents a properly supported Motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. While the Court views the evidence in favor of the nonmoving party and gives that party the benefit of every justifiable inference that may be drawn from that evidence, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but * * * must set forth *specific facts* showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure,* [emphasis supplied]; *Krenik v. County of LeSueur,* 47 F.3d 953, 957 (8th Cir.1995); *State of Nebraska ex rel. Nelson v. Central Interstate Low–Level Radioactive Waste Commission,* 26 F.3d 77, 80 (8th Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 483, 130 L.Ed.2d 395 (1994); see also, *Cram v. Lamson & Sessions Co.,* 49 F.3d 466, 471 (8th Cir.1995); *Barnard v. Jackson County, Missouri,* 43 F.3d 1218, 1223 (8th Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 53, 133 L.Ed.2d 17 (1995).

The non-moving party may not rest upon the mere denials or allegations of its pleadings, nor may it simply argue that operative facts will be subsequently developed which will support its claim. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* supra at 586, 106 S.Ct. at 1355–56 ("[O]pponent must do more than simply show there is some metaphysical doubt as to the material facts."); see, generally, S. Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 188 (1987).

Moreover, a party is entitled to Summary Judgment where its opponent has failed "to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra at 322, 106 S.Ct. at 2552; *St. Paul Fire & Marine Ins. Co. v. Federal Deposit Ins. Corp.,* 968 F.2d 695, 699 (8th Cir.1992). In such a case, no genuine issue of material fact will be found to exist because "a complete failure of proof concerning an essential element of [that party's] case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552; *Fischer v. NWA, Inc.,* 883 F.2d 594, 599 (8th Cir.1989), cert. denied, 495 U.S. 947, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990). "In determining whether a material factual dispute exists, the court views the evidence through the prism of the controlling legal standard." *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993). If reasonable minds could differ as to the import of the evidence, however, Summary Judgment should not be granted and, in exercising its function, the Court is not to weigh the evidence. *Anderson v. Liberty Lobby, Inc.,* supra at 250–51, 106 S.Ct. at 2511–12; *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987).

### 2. *Legal Analysis.*

We first address the parties' cross-Motions for Summary Judgment, then proceed to USL's Motion for Partial Summary Judgment, and conclude with an assessment of Mylan's Partial Summary Judgment Motions.

#### a. *The Parties' Cross–Motions For Partial Summary Judgment.*

##### 1) *Mylan's Statute of Frauds Defense.*

Mylan has asserted a Statute of Frauds defense, and has moved for the entry of Summary Judgment on USL's breach of contract claim. In response, USL has countered by moving for Summary Judgment on Mylan's Statute of Frauds defense.

The Statute of Frauds, as contained in the Uniform Commercial Code ("U.C.C."), is conceded by both parties as controlling our ruling on the pending cross-Motions, and is clear in requiring that a contract for the sale of goods, which entails a price of $500 or more, is not enforceable unless the agreement is supported by a writing which:

1. evidences a contract for the sale of goods;

2. is signed by the party against whom enforcement of the alleged contract is sought; and,

3. *specifies a quantity. Minnesota Statutes Section 336.2–201(1).*

In evidencing an enforceable contract, it is not necessary that the writing state all of the material terms of the agreement, for "[a]ll that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." *Minnesota Statutes Section 336.2–201,* U.C.C. Comment 1.

■ With respect to the specification of the quantity involved, the number of items "need not be accurately stated but recovery is limited to the amount stated." *Id.; W.H. Barber Co. v. McNamara–Vivant Contracting Co.,* 293 N.W.2d 351, 356 (Minn.1979); *Starry Const. Co., Inc. v. Murphy Oil USA, Inc.,* 785 F.Supp. 1356, 1361 (D.Minn.1992), aff'd, 986 F.2d 503 (8th Cir.1993). Moreover, in sales transactions which involve merchants, an otherwise satisfactory writing need not be signed by the party to be charged if, "within a reasonable time," a "writing in confirmation of the contract * * * is received," and the recipient has failed to object, in writing, to the contents of the confirmation within ten days of its receipt. *Minnesota Statutes Section 336.2–201(2).* This method of satisfying the Statute of Frauds is sometimes referred to as the "merchant's exception." See, *M.K. Metals, Inc., v. Container Recovery Corp.,* 645 F.2d 583, 591 (8th Cir.1981); *Starry Const. Co., Inc. v. Murphy Oil USA, Inc.,* supra.

■ As a consequence, between merchants, the failure to answer an adequate confirmatory letter deprives the defaulting party of any resort to the Statute of Frauds defense. This failure to respond, however, does not establish the existence of an allegedly enforceable contract, for the party, who asserts the validity of the alleged contract, maintains the burden of persuading the trier-of-fact that a contract actually exists, as well as in establishing the actual terms and conditions of that contract. *UFE Inc. v. Methode Electronics, Inc.,* 808 F.Supp. 1407, 1412–13 (D.Minn.1993); see also, *Minnesota Statutes*

*Section 336.2–201,* U.C.C. Comment 3. In simple terms, the Statute of Frauds is an affirmative defense and, as such, the party who raises that defense bears the burden of proving its existence. *Starry Const. Co., Inc. v. Murphy Oil USA, Inc.,* supra. Therefore, the determination of whether the Statute of Frauds has been satisfied is, generally, a question of law. *UFE Inc. v. Methode Electronics, Inc.,* supra; *Starry Const. Co., Inc. v. Murphy Oil USA, Inc.,* supra.

■ Mylan insists that no writing exists, which confirms that an agreement was reached between the parties on April 26, 1994—or on any other date—and which adequately conforms to the requirements of Minnesota's Statute of Frauds. Accordingly, Mylan requests that Summary Judgment be granted on the Plaintiff's breach of contract claim. In return, USL urges that its letter of April 29, 1994, which was telefaxed from Kralovec to Martin, was a confirmatory writing which adequately satisfies the merchant's exception to the Statute of Frauds. Therefore, our analysis turns to USL's letter of April 29, 1994, so as to determine if that letter conforms to the prerequisites of the Statute of Frauds.

Given the Record before us, we have no difficulty in concluding that USL's letter amply evinces a contract for the sale of goods. The letter makes reference to "the collaboration" between the parties, and memorializes that its express purpose was "to summarize what has been agreed upon." Thereafter, the letter details the material terms of the parties' purported agreement, inclusive of the pricing terms and of the place of delivery. Indeed, in its concluding paragraph, the letter states:

We at Upsher–Smith Laboratories, Inc. appreciate the opportunity to work with your company and to demonstrate the effectiveness of our unique methods of marketing products. We look forward to the start of what we hope will be a mutually beneficial and profitable relationship, and hope that we can look at other products which will fit into this joint strategy in the future.

Without serious question, these passages "afford a basis for believing," that the oral agreement, which USL seeks to enforce at Trial, "rests [up]on a real transaction." In fact, Mylan admits that this aspect of the Statute of Frauds has been fully satisfied by USL's letter of April 29.

Moreover, we conclude that USL's letter satisfies the signature requirement of the Statute of Frauds, as it is undisputed that both Mylan and USL are "merchants."[3] Although Mylan received USL's letter on April 29, 1994, and knew of its contents as of that date, the Record is uncontroverted that Mylan never objected, in writing, to the representations contained therein.[4] Rather, Mylan argues that the April 29 letter did not satisfy the requisites of the Statute of Frauds, because the letter fails to specify the quantity of product to be purchased. To this, USL counters by asserting that the letter adequately addresses the quantity requirement by revealing that the parties were intending a "requirements contract."

A requirements contract "is generally defined as a contract in which the seller promises to supply all the specific goods or services which the buyer may need during a certain period at an agreed price in exchange for the promise of the buyer to obtain his required goods or services exclusively from the seller." *Propane Industries, Inc. v. General Motors Corp.*, 429 F.Supp. 214, 218 (W.D.Mo.1977). A writing, which contemplates a requirements contract, satisfies the Statute of Frauds even though the writing does not detail any specific quantities. *Zayre Corp. v. S.M. & R. Co., Inc.*, 882 F.2d 1145, 1154 (7th Cir.1989).

Mylan maintains, however, that the confirmation letter fails to satisfy the Statute of Frauds because it fails to record any agreement, on USL's part, to exclusively purchase its Cimetidine requirements from Mylan. We disagree. A writing, which confirms a requirements contract, comports with the Statute of Frauds when there is some language present "which indicates that the quantity to be delivered under the contract is a party's requirements or output." *Eastern Dental Corp. v. Isaac Masel Co., Inc.*, 502 F.Supp. 1354, 1364 (E.D.Pa.1980). Furthermore, "the U.C.C. does not require certain particular words to enforce a requirements contract." *Essco Geometric v. Harvard Industries*, 46 F.3d 718, 728 (8th Cir.1995); see also, *Koch Hydrocarbon Co. v. MDU Resources, Inc.*, 988 F.2d 1529, 1541 (8th Cir. 1993) (The U.C.C. does not require certain "buzz words" to establish a requirements contract).

In our view, USL's confirmatory letter contains sufficient detail to reflect the formation of a requirements contract between the parties. The letter opens with the phrase "[s]o much exciting news has transpired in the last week regarding the *collaboration* between Mylan Laboratories and Upsher–Smith Laboratories, Inc. * * *." [Emphasis supplied]. Thereafter, the letter states, "[w]e at Upsher–Smith look forward to marketing an exclusive private label brand of Cimetidine." The letter then specifies minimum order quantities for Cimetidine, with "lot size quantit[ies]" serving as the minimum order for the 300mg and 400mg tablet strengths and "reasonable quantit[ies]" as the minimum order for the 200mg and 800mg strengths.[5] The letter further

---

**3.** The Uniform Commercial Code defines the term "merchant" to mean "a person who deals in goods of the kind or otherwise by [their] occupation holds [one self] out as having knowledge or skill peculiar to the practices or goods involved in the transaction * * *." *Minnesota Statutes Section 336.2–104(1)*.

**4.** Mylan argues that Martin voiced oral objections to USL's letter, in conversations he had with representatives of USL, and within a short time after the letter's receipt. Nonetheless, the Statute of Frauds clearly requires a written statement of a party's objection to a confirmatory letter, and oral objections are insufficient to pre-

serve a Statute of Frauds defense. See, *Minnesota Statutes Section 336.2–201(2)*.

**5.** We believe that, in and of themselves, these references to "lot size quantit[ies]" and "reasonable quantit[ies]" are sufficient to satisfy the quantity requirement of the Statute of Frauds. A quantity term is sufficiently expressed even when the term itself is imprecise. See e.g., *Great Northern Packaging v. General Tire*, 154 Mich. App. 777, 399 N.W.2d 408, 413 (1986) (The Court found that the term "blanket order" expressed a quantity term.).

specifies that USL's minimum orders were to be "submitted via a rolling 12 month forecast which will be updated by the 15th each month," with "[f]irm purchase orders" to be "sent 90 days in advance of shipment." Finally, the letter concludes by stating "[w]e look forward to the start of what we hope will be a mutually beneficial and profitable relationship, and hope that we can look at other products which will fit into this *joint strategy* in the future." [Emphasis supplied].

Mylan argues, however, that when each of these provisions is considered in isolation, they do not allow the reasonable inference that USL's letter confirms the existence of an exclusive requirements contract. In this respect, Mylan contends that the phrase "exclusive private label brand of cimetidine" demonstrates only that USL intended to exclusively market its own private label brand of Cimetidine, and that the phraseology does not confirm that USL would purchase its Cimetidine requirements *exclusively* from Mylan. In addition, Mylan maintains that the words "rolling forecasts" only refer to a planning tool and do not reveal any obligation on USL's part to include all of its Cimetidine requirements in its rolling forecasts.

■ Contrary to Mylan's argument, however, we believe that the provisions of USL's letter must be read as a unified whole, and not parsed out into individually unrelated fragments. In satisfying the Statute of Frauds, there is no invariable requirement that a writing, in confirmation of a requirements contract, must explicitly state that the buyer will buy its requirements exclusively from the seller. Rather, "in certain instances, the promise to buy exclusively from the seller can be implied from the contract." *Zayre Corp. v. S.M. & R. Co., Inc.*, supra at 1154–55. We believe those circumstances to be present here. Perhaps, when viewed in detached segregation, the phrases that Mylan has isolated may not evince a Cimetidine requirements contract but, when viewed as an integrated whole, we believe that USL's voices an unmistakable intent to commit USL, exclusively, to Mylan for USL's Cimetidine needs.

In so concluding, we underscore that the inference, which we have reasonably drawn from the letter's provisions, does not establish the existence of a requirements contract between the parties, for USL must still prove the existence of such a contract to the trier-of-fact. As the U.C.C. clearly commands, its provisions are to "be liberally construed and applied to promote its underlying purposes and policies," which include "the continued expansion of commercial practices through custom, usage, and agreement of the parties." *Minnesota Statutes Section 366.1–102(1)*. We believe that our reading of USL's letter is not only consistent with common commercial practices, but is a faithful application of the U.C.C. "Justice would be thwarted by denying enforceability upon the basis of a lack of a specific quantity[,] [as] [t]he code was enacted to prevent just such an inequitable result." *O.N. Jonas Co., Inc. v. Badische Corp.*, 706 F.2d 1161, 1165 (11th Cir.1983) (holding that the phrase "[a] potential program utilizing our yarn was discussed in 1977 and we indicated that we would supply the yarn if we were provided a Heller guarantee on our form" sufficiently evidenced a requirements contract for Statute of Frauds purposes). Therefore, we recommend that Mylan's Motion for Partial Summary Judgment be denied, that USL's Motion for Partial Summary Judgment be granted, and that Mylan's Statute of Frauds defense be stricken.

### 2) *Mylan's Termination of Contract Defense.*

Mylan has also argued that, if a requirements contract had been formed between the parties, it retained the right to terminate that contract at will, under Minnesota Statutes Section 336.2–309, since the contract contained no durational term. Further, Mylan contends that, in fact, it terminated that contract on May 24, 1994, when Todd informed the USL executives that Mylan would not supply USL with Cimetidine for the Cimecon launch. Therefore, Mylan asserts that it is entitled to Summary Judgment, on USL's breach of contract claim, since there was no contract that could have been breached.

In response, USL contends that their contract with Mylan was not terminable-at-will because it was a requirements contract which, inherently, contained a durational term. In support of this contention, USL relies upon that portion of the Court's opinion, in *UFE Inc. v. Methode Electronics, Inc.*, supra at 1413, which provides as follows:

"[A] requirements contract contains a durational term by definition because it reflects an agreement to supply a specified product for as long as the buyer requires it. Thus, an agreement to enter into a requirements contract necessarily contains a durational term within the meaning of section 336.2–309(2)."

As a consequence, USL also seeks a Summary Judgment on this issue as, in its view, Mylan was not at liberty to unilaterally terminate their requirements contract at its own will.

As here pertinent, Minnesota Statutes Section 336.2–309 provides as follows:

(2) Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated by either party.

(3) Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable.

Since Mylan has raised the contract's termination as an affirmative defense, it has the burden of proving that each of these statutory elements have been satisfied. See, e.g., *Krueger v. Saiki*, 19 F.3d 1285, 1286 (8th Cir.1994) *per curiam*, cert. denied, —— U.S. ——, 115 S.Ct. 269, 130 L.Ed.2d 187 (1994); *Paul v. Missouri Pacific Railroad Co.*, 963 F.2d 1058, 1059 (8th Cir.1992), cert. denied, 506 U.S. 999 (1992). Therefore, Mylan bears the burden of demonstrating that its contract with USL was indefinite—and, therefore, terminable at will—and that USL received reasonable notice of Mylan's termination. *Minnesota Statutes Section 336.2–309.*

We find USL's argument that, by definition, a requirements contract contains a durational term, to be unavailing. Whatever may have been the circumstances in *UFE Inc.*,[6] every contract—including one that includes an indefinite length of performance—has a durational element. The crux of the issue, therefore, is not whether a requirements contract has a durational term, but whether that term, as here agreed upon by the parties, was indefinite. Unquestionably, the agreement at issue was for an indefinite period.[7]

Notwithstanding our conclusion that Mylan could terminate their arrangement with USL at will, we are unable to conclude that Mylan has satisfied the second element of its required proof, at least as a matter of law. Whether Mylan provided reasonable notice of its termination to USL is a determination fraught with genuine issues of material fact. As Comment 8 to Section 336.2–309 states, "the application of principles of good faith and sound commercial

---

**6.** The language quoted from the Court's decision in *UFE Inc. v. Methode Electronics, Inc*, 808 F.Supp. 1407, 1413 (D.Minn.1993), contained no citation of authority for the proposition upon which USL has relied, and Mylan has drawn our attention to directly contradictory authority. As but one example, in *Globemaster, Inc. v. Magic Amer. Chem. Corp.*, 386 F.2d 420 (6th Cir.1967), the Court specifically found that a requirements contract for the purchase of adhesives, which contained no definite durational term, was terminable-at-will. *Id.*, at 421. We also note the following commentary, which is at odds with the result that USL seeks to obtain.

The terms of a requirements contract bind the seller to furnish the goods to meet the buyer's needs for a duration of time established by the

contract and for no longer period than that time established by the contract.

1 Nelson & Horwicz, Eds., *Williston On Sales*, § 10–7, p. 454 (5th Ed.1994). We need not tarry on this point, however, since we regard the durational issue as no issue at all.

**7.** Mylan insists that the duration of the alleged contract was never discussed, while USL has offered ambiguous evidence on this point, with its executives averring that the supply agreement was intended by the parties to last as long as the arrangement should prove profitable. We think the indefiniteness of such an arrangement, at least insofar as its intended duration is concerned, is self-obvious.

practice normally call for such termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement." Accordingly, "[t]he consideration of what constitutes sufficient or reasonable notice of termination depends on the circumstances of the particular case," and "hinge[s] closely upon the amount of time necessary to enable the distributor to look for a new source of supply." *Aaron E. Levine & Co., Inc. v. Calkraft Paper Co.*, 429 F.Supp. 1039, 1050 (E.D.Mich.1976); see also, *Jo–Ann, Inc. v. Alfin Fragrances, Inc.*, 731 F.Supp. 149, 160 (D.N.J.1989); *Teitelbaum v. Hallmark Cards Inc.*, 25 Mass.Ct. App.Ct. 555, 520 N.E.2d 1333, 1336 (1988).

Here, the amount of time that would have been necessary for USL to obtain an alternate source of Cimetidine, following Mylan's refusal to supply the Cimecon launch, is disputed by the parties. Mylan's expert is of the opinion that USL could have quickly located another supplier, while USL's expert has opined that at least two to three months would have been required to secure a replacement private label supply agreement, which would be comparable to that which, assertedly, existed between Mylan and USL. Indeed, USL's expert has expressed the view that such a delay could have precluded USL from entering the generic Cimetidine market altogether. In view of these material issues of fact, Mylan's contract termination defense is not resolvable by Summary Judgment, and the parties' cross-Motions should be denied.

b. *USL's Motion For Partial Summary Judgment On The Defense Of Commercial Impracticability.*

Mylan has raised commercial impracticability as an affirmative defense, by arguing that, even if a Cimetidine requirements contract had been formed on April 26, 1994, Mylan's performance of that contract would have been excused because the shortage of the requisite raw materials for Cimetidine made that performance commercially impracticable. In turn, USL argues that Mylan cannot establish commercial impracticability and, therefore, that Summary Judgment on that issue should be granted to USL.

1) *Standard of Review.*

To succeed on its defense of commercial impracticability, Mylan must prove three basic elements. First, it must demonstrate that an unforeseen event occurred, the non-occurrence of which was a basic assumption underlying the agreement, and that the event made performance of Mylan's contractual obligations commercially impracticable. Second, Mylan must demonstrate that it made "fair and reasonable" allocations of Cimetidine to its customers. Lastly, Mylan must establish that it provided USL with seasonable notice, both of the delay or nondelivery, and of the estimated amount of supply that would be available to USL. *Minnesota Statutes Section 336.2–615; Barbarossa & Sons, Inc. v. Iten Chevrolet, Inc.*, 265 N.W.2d 655, 658 (Minn.1978).

2) *Legal Analysis.*

According to USL, Mylan cannot establish the first two of these elements. Given the state of the Record before us, we concur in USL's view that Mylan will not be able to demonstrate that the shortage of raw material was an unforeseen contingency and, therefore, we recommend that USL's Motion for Summary Judgment be granted.

 Under the doctrine of commercial impracticability, the element of unforeseeability requires a "determination of whether the risk of the given contingency was so unusual or unforeseen and would have such severe consequences that to require performance would be to grant the promisee an advantage for which he could not be said to have bargained in making the contract." *Barbarossa & Sons, Inc. v. Iten Chevrolet, Inc.*, supra. Expressed somewhat more fully, the test to be applied, under Section 336.2–615, is as follows:

> [W]hether the contingency which developed was "one which the parties could reasonably be thought to have foreseen as a real possibility which could affect performance" and was thereby "one of that variety of risks which the parties are tacitly assigning to the promisor by their failure to provide for it explicitly." If it was, performance was required; if not, performance is excused.

*Id.,* quoting *Mishara Construction Co., Inc. v. Transit–Mixed Concrete Corp.,* 365 Mass. 122, 310 N.E.2d 363, 367 (1974). Moreover, "if the factors which create the event are within the control of the party asserting commercial impracticability, then the inability to perform is the result of the party's conduct rather than the event itself." *Roth Steel Products v. Sharon Steel Corp.,* 705 F.2d 134, 150 (6th Cir.1983).

█ Here, the evidence is undisputed that Mylan knew, as early as April 6, 1994—that is, nearly three weeks before the telephone conference of April 26, which USL claims consummated the alleged requirements contract—that its pre-book orders for Cimetidine were nearly double the amount of its available supply. At that time, according to Mylan's own executives, Mylan knew that it would have to allocate Cimetidine to its customers. Mylan also admits that it knew, at that time, that it was the only generic manufacturer who had received an ANDA for Cimetidine. Although both Novapharm and Endo subsequently received ANDAs before the end of that month, Mylan admits that it knew, at all relevant times, that both of these companies would be supplied by Lek, the same supplier who was causing Mylan's supply problems.

Indeed, Mylan has acknowledged that, because of these supply problems with Lek, it began looking for a second source of raw materials in March of 1994. The only other generic supplier of Cimetidine, as of that date, was Lederle. As a result, the evidence of Record demonstrates that, if Mylan and USL did, in fact, enter into a requirements contract on April 26, their arrangement was made at a time when Mylan knew that its existing orders were double its supply of raw material, and that three of the four existing manufacturers of Cimetidine were being supplied with raw material from the same uncertain supplier. Furthermore, if a contract was consummated, it was entered barely three weeks before the time at which SKB's patent would expire. Obviously, at that point, Mylan could foresee that no other ge-

neric manufacturers were likely to enter the Cimetidine market before the critical date of patent expiration.

In this respect, we are closely guided by the Court's analysis in *Roth Steel Products v. Sharon Steel Corp.,* supra. There, the defendant steel manufacturer sought to invoke the defense of commercial impracticability so as to excuse its performance, during a period of materials shortage, of a steel supply contract. In affirming the District Court's rejection of this defense, the Court reasoned as follows:

> The record indicates that Sharon continued to accept an unprecedented amount of purchase orders during the first half of 1973 even though it knew that raw materials were in short supply. In light of these facts, we believe that sufficient evidence supports the district court's conclusion that Sharon's inability to perform was a result of its policy of accepting far more purchase orders than it was capable of fulfilling, rather than as a result of the existing shortage of raw material.

*Id.,* at 150.

The same may be said here. As we have noted, Mylan had accepted pre-book orders which vastly exceeded its existing supply of raw materials. Further, by the time that the alleged contract was formed, Mylan knew, or should have known, of the crucial lack of competition amongst the generic Cimetidine manufacturers and, therefore, Mylan could reasonably foresee that the cancellation of pre-book orders, that it had earlier projected, would not occur.

█ Therefore, given these circumstances, we believe that, at the time of the alleged contract, the shortage of raw material was a contingency which the parties "could reasonably be thought to have foreseen as a real possibility which could affect performance" and was, therefore, "one of that variety of risks which the parties were tacitly assigning [to Mylan] by their failure to provide for it explicitly." *Barbarossa & Sons, Inc. v. Iten Chevrolet, Inc.,* supra.[8] Accord-

8. Mylan has argued that a genuine issue of material fact exists concerning the foreseeability of the raw materials shortage. In support of this argument, Mylan maintains that, while it could

foresee, in early April of 1994, that it would not have enough Cimetidine available, from the validation lots, to fill its pre-book orders, it did not know that it would have to allocate product,

ingly, if Mylan did commit itself to supply Cimetidine to USL, it did so with an indisputable awareness that the requisite raw materials might well be in short supply. We conclude, as a result, that Mylan cannot demonstrate that the shortage of Cimetidine raw materials was an unforeseen event at the time of the alleged contract, and we recommend that USL's Motion for Summary Judgment on this issue be granted.[9]

### c. *Mylan's Remaining Motions for Partial Summary Judgment.*

Mylan has advanced a series of Motions to strike individualized claims, which we address *seriatim.*

### 1) *Whether The Parties Intended Only To Be Bound By A Written Contract.*

Mylan contends that the parties did not intend to be contractually bound until a written contract had been signed. In support of this contention, Mylan directs us to a number of handwritten notations, which were prepared by certain of the participants in the April 26 telephone conference, and which make reference to a contract.[10] Since no written contract was ever executed, Mylan argues that it should be granted Summary Judgment on USL's breach of contract claim. In response, USL does not dispute the content of the notations which have been attributed to its executives, but asserts that the comments have been taken out of context, and insists that the absence of a formal, written agreement is solely attributable to Mylan's assurance that its word was its bond.

▪ Of course, "where the parties know that the execution of a written contract was a condition precedent to their being bound, there can be no binding contract until the written agreement was executed." *Dataserv Equip. v. Technology Finance Leasing,* 364 N.W.2d 838, 841 (Minn.Ct.App.1985) review denied (May 31, 1985); see also, *Northway v. Whiting,* 436 N.W.2d 796, 799 (Minn.

---

from its subsequently produced lots of Cimetidine, until it discovered, in early May of 1994, that its competition consisted only of Novapharm, Endo and Lederle. We are not persuaded by this argument. The standard for foreseeability is an objective one. Although, at the time of the alleged contract, Mylan may have subjectively believed that the shortage of raw materials extended only to the validation lots, this belief was objectively unreasonable given the volume of Mylan's pre-book orders, the state of its existing supply of raw materials, and the relative lack of competition in the pertinent marketplace.

9. USL has also urges Summary Judgment because Mylan's system of allocation was neither fair nor reasonable. In the interests of completeness, we briefly address this argument.

Mylan assert that, in allocating Cimetidine to its customers, it first allotted product, from the validation lots, to its warehousing chain customers, and then allocated the remaining product, in the same lots, to its existing wholesaler customers. As a consequence, customers from Mylan's distributor class were not allocated product from the validation lots, except for Qualitest and the American Association of Retired Persons, both of whom Mylan treated as warehousing chains for allocation purposes. Mylan maintains that it allocated Cimetidine, from its subsequent production lots, to all trade classes on a first-come, first-served basis. USL disagrees, because it never received any product.

Minnesota Statutes Section 336.2–615(b) provides that a seller must allocate production and deliveries amongst its customers, but it may also include regular customers, who are not then under contract, as well as the seller's own requirements for further manufacture. The Statute also provides that the seller "may so allocate *in any manner* which is fair and reasonable." [Emphasis supplied]. Given this broad statutory latitude, we believe that the fairness or reasonableness of Mylan's system of allocation presents genuine issues of material fact. See, *Alimenta (U.S.A.), Inc. v. Cargill Inc.,* 861 F.2d 650, 654 (11th Cir.1988); *Cliffstar Corp. v. Riverbend Products, Inc.,* 750 F.Supp. 81, 87 (W.D.N.Y.1990); *Terry v. Atlantic Richfield Co.,* 72 Cal.App.3d 962, 140 Cal.Rptr. 510, 512 (1977).

In addition, USL argues that Mylan's allocation system was neither fair nor reasonable because, when Mylan did offer to deliver Cimetidine to USL, it did so at an increased price. We agree with Mylan, however, that the question of whether the alleged contract contained a fixed-price term, or an open price structure, presents genuine issues of material fact which preclude the entry of Summary Judgment. See, *infra* pp. 40–41.

10. These excerpted notations read as follows:

1. *"need the contract ASAP."* (Dale Martin, Mylan's Director of Advertising and Promotions) [Emphasis in original];
2. "Contract will be needed between USL and Mylan." (John Larkin, USL's Quality Assurance Manager);
3. "Contract: TBD" (Douglas Pletcher, USL's Product Manager); and
4. *"Put Contract"* (Paul Kralovec, USL's Vice President of Finance) [Emphasis in original].

Ct.App.1989). In this case, however, a genuine issue of material fact separates the parties—Mylan contends that a formal written contract was agreed to be consummated, while USL disputes that Mylan expected anything more formalized than to be committed by its word. Accordingly, we recommend that this aspect of Mylan's Motion for Summary Judgment be denied.

### 2) Whether the Parties Agreed That The Alleged Contract Would Be Exclusive.

■ Mylan contends that it should be granted Summary Judgment, on USL's breach of contract claim, because a requirements contract demands that the buyer agree to purchase all of its requirements from the seller and, in this case, USL and Mylan never even discussed whether USL would purchase Cimetidine exclusively from Mylan. USL disputes this contention, and has offered the testimony of two of its executives, who participated in the telephone conference of April 26, 1994, and who have testified that the parties agreed that USL would purchase its Cimetidine requirements exclusively from Mylan.[11] Since the dispute presents a genuine issue of material fact, we recommend that Mylan's Motion be denied.

### 3) Whether The Alleged Contract Contains An Open Price Term.

■ Mylan contends that the parties' alleged contract anticipated that the price of Cimetidine would change over time, but that the parties left unresolved how the price would change and, therefore, the contract is too indefinite to be enforced. Alternatively, Mylan urges us to apply the "gap-filler" provision of Minnesota Statutes Section 336.2–305(1), to supply the missing price formulation. This Section provides that, when a contract price is left open or unsettled, "the price is a reasonable price at the time for delivery * * *." *Minnesota Statutes Section*

336.2–305(1). We find neither argument to have merit.

Whether the alleged contract includes an open price term is a very disputed topic. Mylan contends that the prices, which were discussed during the telephone conference of April 26, were "first stage," that is, they were subject to change. On the other hand, USL attests that the agreed upon prices were fixed and, in support of that contention, USL has offered the opinion of its expert, Edward Thwaite ("Thwaite"), that fixed prices are customary in the pharmaceutical industry, when a requirements contract is involved. Necessarily, we find disputed, material questions of fact which preclude a dispositive ruling at this time, and we recommend that this aspect of Mylan's Motion be denied.

### 4) Whether USL Can Recover Its Lost Profits.

In Mylan's view, USL may not recover, as consequential damages, its alleged lost profits, because USL has made no attempt, until one month before the commencement of this litigation, to mitigate its damages by obtaining Cimetidine from another source.

### a) Standard of Review.

■ Of course, under Minnesota law, a buyer may obtain consequential damages, which stem from a seller's repudiation of a contract for the sale of goods, but such damages are only allowed to the extent that they "could not reasonably be prevented by cover or otherwise." *Minnesota Statutes Section 336.2–715(2)(a).* "The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." *Minnesota Statutes Section 336.2–712,* U.C.C. Comment 2. The burden of proof rests upon the seller to establish that the buyer acted unreasonably in failing to pre-

---

**11.** In part, this testimony is presented in Kralovec's Affidavit, in which he avers that, during their telephone conference, he and his colleagues specifically discussed exclusivity with Martin. Mylan, however, argues that this testimony has been contradicted by Kralovec's earlier deposition testimony. We have reviewed the pertinent excerpts of testimony, and we find no striking inconsistencies. As best as we can tell, Kralovec contends that exclusivity was discussed and agreed upon, during the telephone conference of April 26, but was not reduced to the participant's notations. Whether this testimony is accurate will require a Jury's determination.

vent his own loss. *Simeone v. First Bank National Association,* 73 F.3d 184, 189 (8th Cir.1996), citing *Bemidji Sales Barn, Inc. v. Chatfield,* 312 Minn. 11, 250 N.W.2d 185, 189 (1977). Furthermore, "the duty to cover 'does not require an injured party to take measures which are unreasonable or impractical or which require expenditures disproportionate to the loss sought to be avoided or which are beyond his financial means.'" *Id.,* quoting *Gerwin v. Southeastern Calif. Ass'n. of Seventh Day Adventists,* 14 Cal.App.3d 209, 92 Cal.Rptr. 111, 117 (1971).

#### b) *Legal Analysis.*

▉▉▉▉ The question of whether a buyer has made a reasonable attempt to cover is usually a question for the trier-of-fact. *Simeone v. First Bank National Association,* supra at 188; *H & W Industries, Inc. v. Occidental Chemical Corp.,* 911 F.2d 1118, 1123 (5th Cir.1990); *AES Technology Systems, Inc. v. Coherent Radiation,* 583 F.2d 933, 942 (7th Cir.1978). Mylan argues, however, that since USL made no attempt to cover—at least until more than four months after the alleged breach of the contract involved—that its attempt at cover should be adjudged unreasonable as a matter of law. We disagree, for USL has offered evidence, both in the form of testimony by its executives, and in the opinion of its expert, that it would have been unable to find an alternate supplier of Cimetidine during the entire period between the alleged breach and its attempt to cover in October of 1994. Although Mylan's experts disagree with USL's assessment, and believe that USL could have obtained Cimetidine from another supplier such as Endo or Novapharm, we need only cite the fact-dependent nature of this disagreement to demonstrate the impropriety of any grant of Judgment as a matter of law. Accordingly, we recommend that this portion of Mylan's Motion be denied.

#### 5) *USL's Implied Contract Claim.*

▉▉▉▉ Mylan seeks an Order that would strike USL's breach of an implied contract claim. A contract may be "implied in fact" if it can be "inferred from the circumstances and conduct of the parties." *Gryc v. Lewis,*

410 N.W.2d 888, 891 (Minn.App.1987). An implied contract "is in all respects a true contract requiring a meeting of the minds" and "differs from an express contract mainly in the manner mutual assent is proved." *Id.* Of course, the test for the formation of a contract is an objective one. *Id.*

▉▉▉▉ In support of its Motion, Mylan argues that USL cannot point to any course of dealing, or to any act, as evidencing the existence of a contract that has been implied in fact. Mylan notes that USL never submitted a purchase order or a 12-month forecast, that Mylan never shipped any Cimetidine to USL, and that USL never sent a single payment to Mylan. In the absence of such evidence, Mylan contends that USL's implied contract claim should fail as a matter of law. We disagree.

▉▉▉▉ Whether an implied contract exists is, generally, a question for the trier-of-fact, *AFSCME Councils 6, 14, 65 and 96 v. Sundquist,* 338 N.W.2d 560, 567 (Minn.1983); *Stubbs v. North Memorial Medical Center,* 448 N.W.2d 78, 82 (Minn.Ct.App.1989), review denied (January 12, 1990); *Carlock v. Pillsbury Co.,* 719 F.Supp. 791, 854 (D.Minn. 1989), and this consideration alone counsels against a grant of Summary Judgment. Furthermore, we believe that USL has proffered sufficient evidence to create a genuine issue of material fact as to whether an implied contract existed between these parties.

USL has asserted that, following the telephone conference of April 26, it undertook substantial preparations to facilitate its Cimecon launch, including the publication of advertisements in national trade journals, and direct mailings to over 67,000 potential customers. In addition, USL has offered evidence that, on May 4, 1994—just five days after the receipt of USL's confirmation letter—a Mylan representative completed an internal document, which has been designated as a "Private Label Request Form," that USL claims to have accurately projected its annual Cimetidine usage under the alleged contract. Given these evidentiary showings, we conclude that a grant of Summary Judgment would be inappropriate, and we recommend that Mylan's Motion be denied.

### 6) *USL's Equitable Estoppel Claim.*

 Mylan urges the award of Summary Judgment on USL's equitable estoppel claim, correctly noting that equitable estoppel is neither a claim nor a defense but, rather, serves as a bar to the assertion of a claim or a defense. See, *Olsen v. United States*, 952 F.2d 236, 240 (8th Cir.1991). Under the laws of Minnesota, equitable estoppel is available when:

1. There has been a misrepresentation of a material fact;

2. The party to be estopped knew or should have known that the representation was false;

3. The party to be estopped intended that the representation be acted upon;

4. The party asserting equitable estoppel lacked knowledge of the true facts; and

5. The party asserting the estoppel did, in fact, rely upon the misrepresentation to his or her detriment.

*Transamerica Ins. Group v. Paul*, 267 N.W.2d 180, 183 (Minn.1978). Here, Mylan asserts that USL cannot identify any misrepresentation that Mylan made to it. In response, USL insists that Mylan made a known misrepresentation when it informed USL that a formal written contract was not necessary to consummate their Cimetidine requirements contract. As a result, USL argues that equitable estoppel should be applied so as to bar Mylan from raising its Statute of Frauds defense.

 While, under Minnesota law, equitable estoppel may be asserted to bar a defense premised upon the Statute of Frauds, see *W.H. Barber Co. v. McNamara–Vivant Contracting Co.*, supra at 357, we have already concluded that the confirmation letter of April 29, 1994, has satisfied any Statute of Frauds, and we have recommended that USL be granted Summary Judgment as to that defense. Therefore, equitable estoppel has no further application in this case, and we recommend that Mylan's Motion for Summary Judgment be granted.

### 7) *Whether USL Can Only Recover Its Reliance Damages Through Promissory Estoppel.*

According to Mylan, if USL should be successful in its promissory estoppel claim, then it should be limited to a recovery of only its reliance damages, and Mylan seeks a ruling to that effect.

#### a) *Standard of Review.*

 Under the doctrine of promissory estoppel, a clear and definite promise, which is expected and intended to induce definite action by the promisee, and which does induce that action, is binding, if injustice can be avoided only by enforcing the promise. *Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 391 (Minn.1992). Contrary to Mylan's assertion, however, a Court "is not *required* under Minnesota law to limit the remedy in promissory estoppel cases to out-of-pocket expenses." *Walser v. Toyota Motor Sales, U.S.A., Inc.*, 43 F.3d 396, 402 (8th Cir.1994) [emphasis in original]. Instead, a Court "is free to exercise its discretion in selecting the [remedy] which it believes best serves the interests of justice." *Id.* Indeed, in *Cohen v. Cowles Media Co.*, supra at 392, the Court specifically approved the following Jury Instruction as to the damages that are recoverable through promissory estoppel:

A party is entitled to recover for a breach of contract only those damages which: (a) arise directly and naturally in the usual course of things from the breach itself; or (b) are the consequences of special circumstances known to or reasonably supposed to have been contemplated by the parties when the contract was made.

Thus, consequential damages, including lost profits, can be recovered under Minnesota law through a theory of promissory estoppel. *Id.*

#### b) *Legal Analysis.*

In this case, USL avers that, because of Mylan's refusal to supply Cimetidine for the Cimecon project, USL missed a rare opportunity to enter a highly profitable market. Given this assertion, we believe that it would be improvident, at this stage, to limit USL's potential recovery to its out-of-pocket expenses. Instead, the Trial Court should consider the proper measure of recovery after hearing all of the relevant evidence and,

therefore, we recommend that Mylan's Motion for Summary Judgment on this issue be denied.

### 8) *USL's Intentional Misrepresentation Claim.*

 Among USL's causes of action is one for intentional misrepresentation. Mylan maintains, however, that such a tort claim is precluded under Minnesota's "economic loss" doctrine, as it has been expressed in *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159 (Minn.1981), and *Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn.1990). We agree, and recommend that Mylan be granted Summary Judgment as to this claim.

### a) *Standard of Review.*

The "economic loss" doctrine was promulgated by the Minnesota Supreme Court's attempt to delineate those remedies that are available in contract, in tort, and under the U.C.C., for claims which arise out of commercial transactions. *Nelson Distributing v. Stewart–Warner*, 808 F.Supp. 684, 686 (D.Minn.1992). As a consequence, in *Superwood Corp. v. Siempelkamp Corp.*, supra at 162, the Court announced the following rule:

> [E]conomic losses that arise out of commercial transactions, except those involving personal injury or damage to property, are not recoverable under the tort theories of negligence and strict products liability.

The Court returned to the "economic loss" doctrine several years later, in *Hapka v. Paquin Farms*, supra, where it addressed, in the following broad strokes, the preemptive effect of the U.C.C.'s remedies upon actions that arise from commercial transactions:

> The Code itself indicates that the U.C.C. is intended to displace tort liability. * * *
> The foundational assumption of the Code as a whole is that by importing to their negotiations their experience in the marketplace, the reasonable contemplation of sophisticated parties is embodied in the transaction. It is at the time of the contract formation that experienced parties define the product, identify the risks, and negotiate a price of the goods that reflects the relative benefits and risks to each. * * * If the Code is to have any efficacy, parties engaged in commercial activity must be able to depend with certainty on the exclusivity of the remedies provided by the Code in the event of a breach of their negotiated agreement.

*Id.*, at 688.

In neither *Hapka*, nor in *Superwood*, did the Court address whether the doctrine of economic loss should bar a tort claim for intentional misrepresentation if it arises out of a commercial transactions.

This issue, however, was presented to the the Court in *Nelson Distributing v. Stewart–Warner*, supra. There, the buyer sued the seller under a variety of theories including intentional misrepresentation. In analyzing that claim, the Court observed that the Minnesota Supreme Court had not addressed the applicability of the economic loss doctrine to a claim of intentional misrepresentation, but that the Minnesota Court of Appeals, in an unpublished decision, had concluded that the broad principles, which were enunciated in *Hapka*, operated as a bar to claims of intentional misrepresentation which emanate from a commercial transaction. *ETM Graphics, Inc. v. H.B. Fuller Co.*, No. CS–91–2103, 1992 WL 61394 (Minn.Ct.App. March 25, 1992), review denied (Minn., June 10, 1992).

While noting that it was not bound by the unpublished decisions of an intermediate State Court, the Court, in *Nelson*, concluded that the Minnesota Supreme Court would follow the Court's reasoning in *ETM Graphics*, and would hold that claims for intentional misrepresentation, which arise in a commercial context, are barred by the economic loss doctrine. *Nelson Distributing v. Stewart–Warner*, supra at 688. In reaching this conclusion, the Court was particularly influenced by the broad language and reasoning of *Hapka*, which the Court determined was "concerned as much with the exclusivity of the U.C.C.'s remedies as it is with the particular tort theories brought by plaintiffs." *Id.* at 687–88.

While the Minnesota Supreme Court has not further addressed this issue, since *Nelson*, we are persuaded by the Court's reasoning in that decision, and we conclude that the broad reasoning of *Hapka* supports the bar

upon intentional misrepresentation claims, which arise in commercial transactions covered by the U.C.C. This conclusion is reinforced by the language of Minnesota Statutes Section 604.10, which provides as follows:

(a) Economic loss that arises from the sale of goods that is due to damage to tangible property other than the goods sold may be recovered in tort as well as in contract, *but economic loss that arises from a sale of goods between parties who are each merchants in goods of the kind is not recoverable in tort.*

(b) *Economic loss that arises from a sale of goods, between merchants, that is not due to damage to tangible property other than the goods sold may not be recovered in tort.* * * * [Emphasis in original].

Although we are unaware of any case law that addresses the import of this language, we are satisfied that the provision corroborates the view of this Court, and the others that have addressed this issue, that USL's intentional misrepresentation claim has been preempted by the provisions of the U.C.C. Therefore, we recommend that Mylan be granted Summary Judgment in this respect.

### 9) *Whether USL Has Suffered Damage To Its Business Reputation.*

▮ Under Minnesota law, injury to business reputation is compensable by money damages. See, *Bonhiver v. Graff*, 311 Minn. 111, 133, 248 N.W.2d 291 (1976); *E.H. Boerth Co. v. Lad Properties*, 82 F.R.D. 635, 646 (D.Minn.1979). Here, Mylan argues that it is entitled to Summary Judgment, on USL's damage to business reputation claim, because USL cannot identify any actual damage to its business reputation which was caused by Mylan's alleged breach of contract. We conclude, however, that a genuine issue of material fact exists, as to the extent, if at all, that USL's business reputation has been damaged.

As here pertinent, USL has offered evidence that, following its aborted Cimecon launch, at least one of its customers has derisively referred to the aggressive marketing campaign, that was associated with Cimecon, as USL's "splash and crash" strategy. USL further advises that it has been forced to respond to numerous customer questions, and complaints, that are associated with the failure of the Cimecon launch. Further, USL has offered the opinion of its expert that, because of the failure of the Cimecon launch, USL has suffered and will continue to suffer damage to its reputation as a result of weakened customer confidence in USL's ability to promote and deliver new drug products.

In addition, USL notes that at least one Court has accepted the principle that a business can suffer compensable damage to its reputation because of the "rippling effect" which occurs when the business' dissatisfied customers communicate to other potential customers the details of an adverse business experience. See, *Rainbow Travel Service v. Hilton Hotels Corp.*, 896 F.2d 1233, 1239 (10th Cir.1990). In view of these circumstances, we are confronted by genuine issues of material fact which effectively precludes Mylan's request for Summary Judgment as to this claim, and the Motion should be denied.

### d. *USL's Motion In Limine To Limit And Exclude Expert Testimony.*

### 1) *Factual Background.*

According to USL, this Motion has three bases. First, USL seeks to have an expert witness, who Mylan has only recently designated, excluded from testifying at Trial. Second, USL seeks to limit the number of other expert witnesses who Mylan can call to testify in this case. Finally, USL seeks to have Mylan's experts supplement their written expert reports so as to include the information that is required by this Court's Pretrial Schedule.

Our Pretrial Schedule, which was issued on January 17, 1995, addresses expert disclosures in the following terms:

That within the foregoing period allotted for discovery, but no later than the dates set forth below, the parties shall retain and disclose to opposing counsel all persons they intend to call as expert witnesses at trial. Each party's disclosure shall identify each expert and state the subject matter on which the expert is expected to testify. The disclosure shall be accompanied by a

written report prepared and signed by the witness. As required by Fed.R.Civ.P. 26(a)(2)(B), the report shall contain:

\* \* \* \* \* \*

d. A complete statement of all opinions to be expressed and the basis and reasons therefor;

e. The data or other information considered by the witness in forming the opinions;

\* \* \* \* \* \*

The plaintiff's disclosures shall be made on or before **August 15, 1995.** The defendant's [sic] disclosures shall be made on or before **August 15, 1995.**

[Emphasis in original].

By agreement of the parties, the deadline for expert disclosures was extended until September 27, 1995, and the parties further agreed that they would have until October 17, 1995, to serve any supplemental expert reports. USL designated its expert—Thwaite—on May 25, 1995, and served a copy of Thwaite's resume.

Thereafter, on September 27, 1995, the parties exchanged expert reports. Thwaite's report is 28 pages in length and is supplemented with exhaustive exhibits. In contrast, Mylan retained four experts, who will testify about the pharmaceuticals industry, and they have served virtually identical five-page reports from each expert.

USL takes exception to these reports for a number of reasons. First, the reports do not set forth the "basis and reasons" for the experts' opinions, as is required by the previously quoted directive of our Pretrial Scheduling Order. Instead, the reports are rife with bald and unsupported conclusions, such as the following:

In the spring of 1994, there existed multiple suppliers of generic cimetidine. If Upsher–Smith had attempted to purchase cimetidine from suppliers other than Mylan, it could have purchased cimetidine.

\* \* \* \* \* \*

A reasonable business person in the position of Upsher–Smith would have obtained an alternate source of supply of generic cimetidine in May of 1994.

\* \* \* \* \* \*

Upsher–Smith has not suffered any damage to its reputation in the industry as a result of Mylan's decision not to supply it with cimetidine.

USL similarly objects to the report of Mylan's accounting expert, which is three paragraphs in length, and which informs, in a similarly conclusive fashion, that "Upsher–Smith has not suffered any damages as a result of any alleged breach of the contract by Mylan."

USL also objects to Mylan's failure to disclose "[t]he data or other information considered by the witness[es] in forming the opinions," as is also required by our Pretrial Schedule. Rather, Mylan's reports all merely assert that the experts have based their opinions "on the pleadings, discovery responses, and depositions in this case." However, as USL correctly notes, as of the date of the reports, none of the depositions had been transcribed and, consequently, the experts could not have based their opinions upon any deposition testimony. Further, USL observes that most of the discovery in this case was conducted pursuant to a Protective Order, under which only one expert for each of the parties was permitted to review the confidential discovery pleadings prior to the submission of the expert reports on September 27, 1995. Thus, USL argues that, consistent with the Protective Order, Mylan's four experts could not have based their opinions on the discovery responses in this case.

In light of its objections to these reports, USL served Mylan with supplemental expert interrogatories, which requested the disclosure of the factual bases for Mylan's experts' opinions and, on October 9, 1995, USL's counsel wrote counsel for Mylan requesting that Mylan's experts disclose the "basis and reasons" for their conclusions, as well as the "data or other information" considered by the experts in formulating their opinions. In this letter, counsel for USL further requested that Mylan identify which of its four pharmaceuticals experts was expected to testify at Trial. In this respect, counsel requested

that Mylan respond to his letter on or before October 13, 1995.

Mylan's response to this letter was simply to notify USL, on October 13, 1995, that it intended to call a fifth expert witness, Timothy Covington ("Covington"), who is a Professor of Pharmacy at Samford University, in order to rebut that portion of Thwaite's report which addresses USL's damage claims. Since Covington was first disclosed after the deadline for expert disclosures, USL has objected to the designation of Covington as untimely, under the Pretrial Schedule. Despite this objection, Mylan served USL with a report from Covington, as well as supplemental reports from some of its other experts. Covington's report was served on October 19, 1995, some three weeks after the deadline for expert disclosures, and two days after the deadline for the submission of supplemental reports.

Finally, USL states that, in response to USL's supplemental interrogatories, Mylan has submitted vague and non-responsive answers which fail to disclose the "basis and reasons" for its experts' opinions. Given this backdrop, we separately address USL's Motion to exclude the testimony of Covington, to limit the number of Mylan's experts, and to require Mylan's experts to supplement their expert disclosures.

### 2) *The Motion In Limine To Exclude Covington.*

#### a) *Standard of Review.*

Obedience to the constraints of the Scheduling Orders of the Court is critical, if the Court is to capably perform its case management responsibilities. *Tomlin v. Holecek,* 158 F.R.D. 132, 135 (D.Minn.1994); *Jochims v. Isuzu Motors, Ltd.,* 144 F.R.D. 350, 356 (S.D.Iowa 1992), citing *Gestetner Corp. v. Case Equipment Co.,* 108 F.R.D. 138, 141 (D.Me.1985). Accordingly, the "flouting of discovery deadlines cause substantial harm to the judicial system." *Jochims v. Isuzu Motors, Ltd.,* supra. Nevertheless, blind adherence to the time constraints of a Sched-

uling Order, without a proper regard for the bases and effects of the non-compliance, may well be inconsistent with the dominant interest of a Trial in ascertaining the truth. *Dabney v. Montgomery Ward & Co.,* 692 F.2d 49, 52 (8th Cir.1982), cert. denied, 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983); *Bradley v. United States,* 866 F.2d 120, 127 n. 12 (5th Cir.1989).

Accordingly, our Court of Appeals has developed a flexible standard in order to preclude fundamental unfairness at the time of Trial. *Boone v. Moore,* 980 F.2d 539, 541 (8th Cir.1992), citing *Wilson v. Beloit Corp.,* 921 F.2d 765, 768–69 (8th Cir.1990). In *Patterson v. F.W. Woolworth Co.,* 786 F.2d 874, 879 (8th Cir.1986), the Court enunciated the factors that the Court would consider in determining whether to exclude "the testimony of a witness not made known in a manner complying with a pretrial order." These factors include:

1. the reasons the party fails to name the witness;

2. the importance of the testimony;

3. the amount of time the opposing party needs to properly prepare for the testimony; and

4. whether a continuance would in some way be useful.

And see, *Citizens Bank v. Ford Motor Co.,* 16 F.3d 965, 966 (8th Cir.1994); *Boone v. Moore,* supra at 541–42.

We now apply these criteria in assessing Mylan's failure to timely disclose Covington as an expert witness.[12]

#### b) *Legal Analysis.*

█ Mylan claims that it failed to name Covington as an expert witness because, although it had initially contacted Covington in early August, it did not know that Covington's testimony would be essential until late September of 1995—after it had received Thwaite's report concerning USL's loss of revenues. Mylan maintains that it was caught by surprise, both by the underlying

---

**12.** Mylan has argued that Covington was timely disclosed because he was a rebuttal witness, and the Pretrial Schedule did not set a deadline for the disclosure of rebuttal witnesses. We reject this contention outright. The Pretrial Schedule set a firm deadline for the disclosure of *all* witnesses, making no distinction between "direct" or "rebuttal" witnesses.

assumptions of the Thwaite report and by his calculation of damages. As a result of that awakening, Mylan contends that it promptly determined that Covington's expertise in the area of "pharmacoeconomics" would be essential to a rebuttal of Thwaite's lost revenue analysis. Covington, however, was on vacation in early October of 1995 and, therefore, Mylan's counsel was unable to contact him until October 10. At that time, Covington was retained as an expert and was disclosed to USL.

■ USL argues that Mylan's dilatory disclosure of Covington reveals an impermissible tactical ploy. Specifically, USL contends that Mylan was quite satisfied with its previously disclosed experts until it was presented with the Thwaite report, at which time Mylan realized that it was going to have to "trade up" for a more imposing expert. While we accept that this could be an accurate reading of Mylan's motivations, without more, little is suggested by Mylan's conduct other than some carelessness on its part in preparing its case. Carelessness, however, is generally an insufficient rationale for excluding an untimely disclosed expert. *Tomlin v. Holecek*, supra at 136. Therefore, we proceed to the next *Patterson* factor.

Mylan insists that Covington's expertise in pharmacoeconomics is vital to rebut what it regards as the flawed assumptions upon which Thwaite's lost revenue analysis is predicated. Given the detailed and comprehensive nature of the Thwaite report, we can accept that an expert with Covington's background may well be necessary to effectively address Thwaite's analysis.

Next, we have the third and, we think, the most problematic of the *Patterson* criteria. In *Tomlin v. Holecek*, supra, we refused to exclude an expert, whose disclosure was untimely, in large part, because the expert's views had long been known to the opposing party's counsel. *Tomlin v. Holecek*, supra at 137. The same cannot be said here, for USL has only been aware of Covington, as a proposed expert, since early October of 1995. Furthermore, Covington's expert report, although more detailed than the boilerplate renditions of Mylan's other experts, still fails to adequately disclose the bases and the rea-

sons which purport to undergird Covington's opinions, nor does the report reveal the raw data which supports the opinions reached. This defect, however, can be satisfactorily cured through a directive that Covington promptly and completely amend his report to rectify these deficiencies. Moreover, Mylan has expressed its willingness to make Covington available, for a deposition, at USL's convenience.

As to the final *Patterson* factor, this case has been set for the Court's Trial block commencing on the week of March 4, 1996, and extending through the week of April 29, 1996. As a consequence, we do not believe that a continuance would be necessary in light of Covington's testimony.

Accordingly, we recommend that USL's Motion to exclude Covington's testimony at Trial be denied.

### 3) *The Motion In Limine To Limit The Number Of Experts.*

#### a) *Standard of Review.*

■ The requirement of full and complete disclosure of experts, and of the opinions they hold, is not a mere recital in the litany of a Pretrial Schedule. Rather, full and complete expert disclosures are an express requirement of Rule 26(a)(2)(B), which provides, in pertinent part, as follows:

> Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; [and] the data or other information considered by the witness in forming the opinions * * *.

The rationale behind this requirement has been ably expressed in the Advisory Committee Notes to the 1993 Amendments to that Rule:

> This paragraph imposes an additional duty to disclose information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective cross-

examination and perhaps arrange for expert testimony from other witnesses.

Moreover, as a sanction for a party's failure to comply with the requirements for expert disclosure, a Court may exclude the testimony of that expert. *Ingram v. Acands, Inc.,* 977 F.2d 1332, 1341 (9th Cir.1992); *China Resource Products (U.S.A.) v. Fayda International, Inc.,* 856 F.Supp. 856, 866–67 (D.Del.1994); cf., *Ortega v. O'Connor,* 50 F.3d 778, 779 (9th Cir.1995).

### b) *Legal Analysis.*

■■■ The reports of Mylan's experts clearly violate both the letter and the spirit of both Rule 26(a)(2), and the Pretrial Order in this case. The reports are uninformative, boilerplate renditions which offer nothing to distinguish the testimony of one expert from another—that is, apart from the expert's names and addresses. Moreover, the reports wholly fail to disclose, in any intelligible way, the facts and rationale which underlie the opinions expressed. As such, the reports provide virtually no assistance to opposing counsel in preparing to cross-examine Mylan's experts. In contrast, USL has properly disclosed the opinion testimony upon which it will rely, and have extended to Mylan's counsel an effective means to avoid unnecessary delay and expense in the conduct of expert discovery.

Although we are hesitant to recommend the exclusion of needed expert opinion, we are satisfied that if any of the experts, other than Covington, were essential to Mylan's case, then Mylan would have properly comported with the requirements of the expert disclosure rules. As allowed by Rule 403, Federal Rules of Evidence,[13] a Court may limit or exclude expert testimony which is cumulative. *Van Dyke v. Coburn Enterprises, Inc.,* 873 F.2d 1094, 1100–01 (8th Cir. 1989); see also, *Green Const. Co. v. Kansas Power & Light Co.,* 1 F.3d 1005, 1013–14 (10th Cir.1993); *Davis v. Mason County,* 927 F.2d 1473, 1483–84 (9th Cir.1991), cert. denied, 502 U.S. 899 (1991); *Leefe v. Air Logistics, Inc.,* 876 F.2d 409, 410–11 (5th Cir.1989).

Since we have already determined that Mylan may call Covington as an expert witness, and since USL has fully deposed Mylan's expert, Fred Bondy ("Bondy"), and has no objection to Mylan's accounting expert, Rholan Larson ("Larson"), we recommend that Mylan be limited to those experts. To permit the repetitious opinion testimony that Mylan has proposed will impermissibly delay the just, speedy and inexpensive resolution of this action. See, *Rule 1, Federal Rules of Civil Procedure.* Given Mylan's disclosures to date, we have no reason to believe that any of its defenses will be prejudiced, in the slightest, by its inability to present the expert opinions of Kathy Hillman, John Romano or George Fields, to the Jury.

### 4) *The Motion In Limine To Require Mylan's Experts To Amend Their Reports.*

To effectuate the intent of the expert disclosure rules, and the prior Order of this Court, Mylan will have 7 days, from the date of this Order and Report and Recommendation, to fully disclose the expert opinions of Covington and Larson and to fully detail all of the bases for those opinions. Upon the determination of the Trial Court, Mylan's failure to make full disclosure, may result in the exclusion of that expert opinion evidence at Trial. Since Bondy has been fully deposed, Mylan shall update his expert disclosures only to the extent that they were not explored during the course of Bondy's deposition.

### e. *Mylan's Motion to Amend Its Answer.*

Mylan seeks leave to Amend its answer in order to interpose the affirmative defense of misrepresentation, and in order to assert a counterclaim for intentional misrepresentation. In support of this Motion, Mylan claims that USL misrepresented that it intended to create a private label brand of Cimetidine so as to directly compete with the brandname varieties of Cimetidine, while, at all times, USL secretly intended to target

---

**13.** Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

the generic varieties of Cimetidine, including that produced by Mylan.

According to Mylan, USL sold its private label concept to Mylan on the premise that Cimecon would be marketed to its customers as a lower cost alternative to brandname $H_2$-receptor antagonists, such as Zantac. Thus, the marketing strategy would be to promote "therapeutic switching," whereby physicians would be induced to prescribe USL's Cimetidine instead of Zantac or one of the other more expensive brands of the drug. Indeed, this is what USL's own presentation slides suggest, since they focus upon USL's marketing effort to target Zantac, and other brandname varieties, and to leave, competitively untouched, the other generic brands of Cimetidine products.

Mylan states that it would have had no interest in supplying Cimetidine to USL if it had been presented with any indication that USL's private label was intended to compete directly with the other generic Cimetidine products, since that form of competition would have conflicted with Mylan's effort to promote its own Mylan label of generic Cimetidine. Instead, Mylan claims that its interest in USL was predicated solely upon USL's "unique" marketing scheme. Now, Mylan claims that it has recently discovered evidence that had revealed USL's secret intention to target other generic Cimetidine products.

For its part, USL denies that it ever made any misrepresentations to Mylan, and it opposes Mylan's Motion to Amend on the ground of futility.[14]

### 1) *Standard of Review.*

■ Where, as here, the parties have exchanged their initial round of pleadings, Rule 15(a), Federal Rules of Civil Procedure, describes the appropriate procedure for amending a pleading as follows:

> * * * [A] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. * * *

In construing this Rule, the Supreme Court has observed:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); see also, *Thompson–El v. Jones,* 876 F.2d 66, 67 (8th Cir.1989). In considering the propriety of an amendment to a pleading, the policy of the Federal Courts, as exhorted by the Federal Rules, is to "accept the principle that the purpose of pleading is to facilitate a proper decision on the merits," and to avoid an approach which would relegate the process to "a game of skill in which one misstep by counsel [might] be decisive to the outcome." *Foman v. Davis,* supra, at 181–82, 83 S.Ct. at 229–30, quoting *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).

■ Where, as here, a party opposes an amendment on the ground of futility, the standard applied is the same as that invoked in a Motion to Dismiss. See *Humphreys v. Roche Biomedical Laboratories, Inc.,* 990 F.2d 1078, 1082 (8th Cir.1993); *Weimer v. Amen,* 870 F.2d 1400, 1407 (8th Cir.1989); *Holloway v. Dobbs,* 715 F.2d 390, 392–93 (8th Cir.1983); *Jeffers v. Convoy Co.,* 650 F.Supp. 315, 317 (D.Minn.1986); *Collyard v. Washington Capitals,* 477 F.Supp. 1247, 1249 (D.Minn.1979); but cf., *Karl's Inc. v. Sunrise Computers, Inc.,* 901 F.2d 657, 660 (8th Cir. 1990) ("colorable showing" sufficient to withstand application of clearly frivolous rule); *Medtronic, Inc. v. Catalyst Research Corp.,* 518 F.Supp. 946, 955 (D.Minn.1981), aff'd., on other grounds, 664 F.2d 660 (8th Cir.1981) (applies undefined "clearly frivolous stan-

---

**14.** USL also opposes Mylan's Motion to Amend on the ground that it is untimely and that, to grant the Motion, would cause USL substantial prejudice. Because we conclude that Mylan's Motion must be denied as futile, we need not consider any alternate grounds.

dard" in distinction to standard normally applied to a motion to dismiss).

■ In the final analysis, the granting of a Motion to amend the pleadings is vested in the sound discretion of the Trial Court. *Ryan v. Sargent,* 969 F.2d 638, 641 (8th Cir.1992), cert. denied, 506 U.S. 1061, 113 S.Ct. 1000, 122 L.Ed.2d 150 (1993); *Thompson–El v. Jones,* supra at 67, citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971).

### 2) *Legal Analysis.*

■ In analyzing Mylan's Motion to Amend, we apply the constraints of Rule 12(b)(6), Federal Rules of Civil Procedure, and accept as true, in a hypothetical sense, all of the factual allegations contained in the proposed amendments, and view those allegations in a light most favorable to Mylan. See, *Patterson v. Von Riesen,* 999 F.2d 1235 (8th Cir.1993); *Schibursky v. International Business Machines Corp.,* 820 F.Supp. 1169, 1175 (D.Minn.1993). Under such an analysis, it is well-established that an action may not be dismissed, for failing to state a claim, unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* supra at 45–46, 78 S.Ct. at 102.

At the outset, we find that Mylan's proposed counterclaim, for intentional misrepresentation, would fail as a matter of law since we have already determined that a tort claim for intentional misrepresentation, which arises from a commercial transaction, is precluded by Minnesota's economic loss doctrine. See, *Conley v. Gibson,* supra at 47–48, 78 S.Ct. at 102–03. As a result, it would be futile to allow Mylan to amend its Answer to assert such a counterclaim. Furthermore, even if the proposed counterclaim were not barred by the economic loss doctrine, neither the counterclaim, nor Mylan's proposed affirmative defense of misrepresentation, could survive a Motion to Dismiss since Mylan can

point to no facts or evidence of Record which supports its allegations of misrepresentation by USL.[15]

■ We have closely reviewed the Record before us and we conclude that it is barren of any factual support for Mylan's misrepresentation claims. Nevertheless, we briefly address Mylan's contentions. First, Mylan maintains that damage analysis of USL's expert is inconsistent with a "branded" marketing strategy and, specifically, Mylan contends that USL's damage analysis is "inconsistent with everything USL ever told Mylan about its plan for marketing Cimecon." Accordingly, Mylan argues that the expert's report demonstrates that USL's intention was to target generic labels of Cimetidine, rather than the brandname $H_2$-receptor antagonists. However, Mylan has failed to identify any of the report's alleged inconsistencies, and our own examination of that report has revealed none.

Second, Mylan claims that, in calculating the alleged lost profits, USL's accounting expert did not factor in any expenses for marketing to physicians. Indeed, the core of Mylan's misrepresentation argument is predicated upon its supposed "shock" when it discovered that, as part of USL's proposed strategy, USL had never intended to "detail physicians," that is, to directly telemarket to physicians. Mylan claims to have only discovered this during the recent depositions of USL officers. Further, Mylan argues that USL's decision to not market directly to physicians is evidence that USL never intended to pursue a "branded" marketing strategy; apparently reasoning that USL could not have fostered "therapeutic switching" without resorting to a direct lobbying of the doctors themselves. Rather, argues Mylan, USL always intended to target other generic labels of Cimetidine rather than branded $H_2$-receptor antagonists.

USL responds that, from the outset, it informed Mylan that its strategy of inducing "therapeutic switching" was premised not

---

**15.** Quite recently, by letter dated February 16, 1996, counsel for Mylan submitted additional materials for our review on this, and on several related issues. We have reviewed these materials and conclude that they do not add substance to the presentations that were previously made both in writing, and at oral argument.

upon the targeting of physicians but, rather, upon marketing its private label of Cimetidine to its niche market of independent pharmacies and managed care groups which, presumably, would exert their influence upon physicians to switch from the branded products to USL's private label. As noted, having reviewed all of the evidence of Record, including copies of the actual slides used by USL in its sales presentation to Mylan, we conclude that the evidence supports USL's and not Mylan's version of the events. None of the slides make any reference to targeting physicians for direct marketing except for one slide that refers to "providing targeted promotion to MD's, Rph's, RN's, etc.," who are employed by Mylan's existing managed care provider customers. Given the complete lack of a factual foundation in support of Mylan's allegations of misrepresentation, we conclude that the futility of Mylan's proposed amended pleadings is beyond dispute. Mylan's Motion for Leave to Amend, therefore, must fail. See, *Humphreys v. Roche Biomedical Laboratories, Inc.*, supra at 1082; *Weimer v. Amen*, supra at 1407; *Holloway v. Dobbs*, supra at 392–93.

f. *Mylan's Motions To Compel Discovery.*

Mylan has moved to compel the production of information and documents that are responsive to five discovery requests. We address each of these requests in turn.

1) *The Gemcor Documents.*

■■■ In the Spring of 1994, USL entered into a private label supply arrangement with Lemmon Company ("Lemmon"), in which Lemmon agreed to supply USL with Gemfibrozil, a drug used to treat high levels of cholesterol. USL then marketed Gemfibrozil under the trademark Gemcor. Mylan speculates that the structure and details of the Gemcor arrangement could somehow provide insight into USL's intentions and designs with respect to the aborted Cimecon project. Accordingly, Mylan has served USL with the following Interrogatories:

21. Describe in detail the business arrangements through which you procure or have procured the product that you sell under the trademark Gemcor. Identify in your answer all documents that memorialize, describe, modify or relate to these

arrangements, including all contracts, letter arrangements, and purchase orders.

22. Describe in detail the business arrangements through which you distribute or have distributed the product that you sell under the trademark Gemcor. Identify in your answer all documents that memorialize, describe, modify or relate to these arrangements, including all contracts, letter arrangements, and purchase orders.

In addition to these Interrogatories, Mylan has served USL with the following three Requests for Documents:

21. All documents identified in response to Defendants Interrogatory Nos. 20–23.

\* \* \* \* \* \*

28. All documents reflecting any price negotiation between Upsher–Smith and the Lemmon Company relating to gemfibrozil.

\* \* \* \* \* \*

31. All financial reports of any kind reflecting Upsher–Smith's actual, typical or projected variable expenses for the period from January 1992 to the present and all documents summarizing expenses incurred by Upsher–Smith with regard to Gemcor.

USL has objected to each of these discovery requests as overly broad, burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Specifically, USL attests that the Gemcor private label bears little, if any, resemblance to the arrangements contemplated for Cimecon. USL asserts that different marketing strategies and approaches distinguish the Gemcor and proposed Cimecon private labels. The expiration of the SKB Cimetidine patent provided USL with an opportunity to enter an open and lucrative market immediately upon patent expiration. In contrast, USL entered the Gemfibrozil market more than a year after the expiration of the branded product, with the intention of adding Gemfibrozil merely as a complement to its existing cardiovascular product line. Thus, USL argues that the structure and details of its Gemcor supply arrangement are of no relevance to the Cimecon project. We agree.

"While the standard of relevance in the context of discovery is broader than in the context of admissibility, this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery." *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir.1992). Instead, "[s]ome threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case." *Id.;* see also, *Wacker v. Gehl Company*, 157 F.R.D. 58, 58 (W.D.Mo.1994).

Mylan has failed to make such a threshold showing here, and we fail to see how the discovery of information on the structure, finance and details of a supply agreement for a product which appears to have been added to USL's product line almost as an afterthought, and more than a year after patent expiration, could be reasonably calculated to lead to the discovery of admissible evidence concerning USL's much anticipated yet never realized, launch of its Cimecon private label. Accordingly, this Motion to Compel is denied.

### 2) *Personnel Files and Records.*

This dispute centers upon Mylan's Document Request No. 18, which demands production of the following:

> All documents relating to the hiring of any employees to work on the Cimecon project, including human resource records.

This request is directed specifically at the records and personnel files for six employees hired to work on the Cimecon project in April of 1994. USL has alleged damages based upon the salaries paid to these employees. Mylan served its document request because it believes that these employees were hired to work on other projects in addition to the Cimecon launch, and that they and their salaries have been absorbed into USL's telemarketing program at no additional cost to USL.

USL has objected to this document request on the grounds that it is overly broad, burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, arguing that these files and records have nothing to do with the issues presented by this case. USL further objects to this request on the ground that the six employees have a privacy interest in the requested documents which outweighs any interest that Mylan has in the production of the documents.

We agree that this request is not reasonably calculated to lead to the discovery of admissible evidence. USL has attested that the six employees were hired to work solely on the Cimecon project, and Mylan can direct our attention to no evidence of Record which contradicts this representation. Instead, Mylan bases this document request only upon its belief that the employees were hired for other work besides the Cimecon project. While the standard of relevancy for purposes of discovery is liberal, "practical considerations dictate that the parties should not be permitted to roam in the shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so." *Carlson Companies, Inc. v. Sperry & Hutchinson Co.*, 374 F.Supp. 1080, 1089 (D.Minn.1974) quoting *Broadway & Ninety–Sixth Street Realty Co. v. Loew's Inc.*, 21 F.R.D. 347, 352 (S.D.N.Y.1958); see also, *Blum v. Schlegel*, 150 F.R.D. 38, 39 (W.D.N.Y.1993). This Motion to Compel is, therefore, denied.

### 3) *Documents Used To Prepare The Mova Draft Contracts.*

In early 1995, USL entered into negotiations with Mova, another generic manufacturer of Cimetidine, regarding the possibility of arranging a supply contract between the two companies. During these negotiations, USL presented Mova with a draft contract setting forth the terms of a potential supply agreement. Mylan speculates that this draft contract is representative of the type of contract which USL had in mind in its negotiations with Mylan. Accordingly, Mylan has served USL with the following document request:

> 19. All documents referred to or relied on as an example in the drafting of the proposed Supply And Distribution Agreement between USL and MOVA.

In response to this request, USL states that it has already produced the draft contract, together with all of the files relating to the Mova negotiations. USL has objected, however, to the production of earlier drafts of the Mova contract on the grounds that the drafts were prepared by its legal counsel, contain privileged communications, and are, therefore, protected from discovery by the attorney-client privilege.[16] We agree.

■■■ "Preliminary drafts of contracts are generally protected by attorney-client privilege, since '[they] may reflect not only client confidences, but also legal advice and opinions of attorneys, all of which is protected by the attorney-client privilege.'" *Muller v. Walt Disney Productions,* 871 F.Supp. 678, 682 (S.D.N.Y.1994) quoting *Schenet v. Anderson,* 678 F.Supp. 1280, 1284 (E.D.Mich. 1988). While this privilege can be waived through disclosure to a third party, *United States v. Cote,* 456 F.2d 142, 144–45 (8th Cir.1972), here, USL maintains that the draft contracts were only disclosed to USL and not Mova or any other outsider. We conclude, therefore, that these draft contracts are shielded from discovery by the attorney-client privilege and, accordingly, deny Mylan's Motion to Compel the production of these draft contracts. *Muller v. Walt Disney Productions,* supra; see also, *Phillips Electronics North America Corp. v. Universal Electronics,* 892 F.Supp. 108, 110 (D.Del. 1995) (attorney-prepared draft licensing agreements containing confidential communications protected by attorney-client privilege); *Schenet v. Anderson,* supra (draft tender offer prepared by attorney protected by attorney-client privilege).

### 4) *USL Contracts.*

■■■ Mylan states that the long-term, exclusive, fixed-price, private label requirements contract, which USL alleges was entered between it and Mylan, was of a type unknown to the generic pharmaceutical industry. Accordingly, Mylan argues that contracts entered between USL and its suppliers are relevant to prove that USL has never

entered a contract similar to the one alleged here, and also to demonstrate the customary, written type of formality employed by USL when contracting. Thus, Mylan has served the following document request:

22. All documents that memorialize, constituted, or modify any contract, agreement, or letter agreement between Upsher–Smith and any manufacturer, wholesaler, or distributor of pharmaceuticals or between any hospital, managed care organization, pharmacy, or buying group of any kind from January 1, 1990, to the present.

USL has objected to this request on the grounds that it is overly broad, burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. USL avers that compliance with this document request would require the production of every contract, purchase order, invoice or similar document, that has been transmitted between USL and its many suppliers and its over 24,000 customers, regardless of the nature of the business transaction, for the last six years. We agree that compliance with this document request would "impos[e] an inordinate and expensive burden for information marginally relevant at most." *Independent Petrochemical v. Aetna Cas. & Sur. Co.,* 117 F.R.D. 283, 286 (D.D.C.1986); cf. *Carlson Companies, Inc. v. Sperry & Hutchinson Co.,* supra at 1088. The Motion to Compel is, therefore, denied.

### 5) *Sales and Profits Forecasts and Plans.*

■■■ This dispute revolves upon the following two document requests:

24. All documents reflecting any sales, revenue, or profit projection or forecast for Upsher–Smith for the period from January 1992 to the present, including Annual Plans, Sales Plans and similar strategic planning documents.

25. All documents reflecting the long-range goals, strategic plans, or corporate direction of Upsher–Smith that were prepared or amended between January 1992 and the present.

---

16. USL also argues that the draft contracts enjoy work product privilege. We reject this contention since USL has made no showing that the draft contracts were prepared in anticipation of litigation.

Mylan argues that this information is relevant and necessary to refute what it characterizes as USL's exorbitant damage claims. Mylan states that it is entitled to review the requested documents "to determine how Cimecon actually fit into USL's corporate strategy in the spring of 1994."

USL has objected to this request as overly broad and burdensome, and as not reasonably calculated to lead to the discovery of admissible evidence. USL further attests that it has already produced all of its non-privileged sales and profit forecasts, strategic plans and other documents that have any relationship to the Cimecon project, and that such production satisfactorily responds to Mylan's request. We agree. The information which USL has already provided is clearly sufficient to enable Mylan "to determine how Cimecon actually fit into USL's corporate strategy in the spring of 1994." For Mylan to obtain discovery of USL's other corporate plans and forecasts, it must first make a threshold showing of relevance. *Hofer v. Mack Trucks, Inc.*, supra; *Wacker v. Gehl Company*, supra. Mylan has failed to make such a showing; accordingly, this Motion to Compel is denied.

NOW, THEREFORE, It is—

ORDERED:

1. That the Defendants' Motion for Leave to Amend their Answer [Docket No. 44] is DENIED.

2. That the Defendants' Motion to Compel Discovery [Docket No. 37] is DENIED.

3. That the Defendants' experts Timothy Covington and Rholan Larson shall amend their expert reports as instructed in the text of this Order **by no later than seven days from the date of this Order.**

AND, It is—

RECOMMENDED:

1. That the Plaintiff's Motion for Summary Judgment on the Defendants' affirmative Statute of Frauds defense [Docket No. 45] be granted.

2. That the Plaintiff's Motion for Summary Judgment on the Defendants' affirmative commercial impracticability defense [Docket No. 45] be granted.

3. That the Plaintiff's Motion for Summary Judgment on the Defendants' affirmative termination of contract defense [Docket No. 45] be denied.

4. That the Defendants' Motion for Summary Judgment on the Plaintiff's intentional misrepresentation claim [Docket No. 48] be granted.

5. That the Defendants' Motion for Summary Judgment on the Plaintiff's negligent misrepresentation claim [Docket No. 48] be granted.

6. That the Defendants' Motion for Summary Judgment on the Plaintiff's unjust enrichment claim [Docket No. 48] be granted.

7. That the Defendants' Motion for Summary Judgment on the Plaintiff's assertion of equitable estoppel [Docket No. 48] be granted.

8. That the Defendants' remaining Motions for Summary Judgment [Docket No. 48] be denied.

9. That the Plaintiff's Amended Motion *in limine* to exclude the testimony of Timothy Covington [Docket No. 54] be denied.

10. That the Plaintiff's Amended Motion *in limine* to exclude the testimony of Kathy Hillman, John Romano and George Fields [Docket No. 54] be granted.

### NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D.Minn. LR1.1(f), and D.Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than March 13, 1996,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than March 13,**

**1996,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.